# FOR PUBLICATION



**FILED**

Oct 28 2014, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEVEN E. RIPSTRA**
**MELISSA J. HALEY**
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES:

**GREGORY F. ZOELLER**
Attorney General

**ROBERT J. HENKE**
Deputy Attorney General

**CHRISTINA D. PACE**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEES
B.C. & J.L.:

**MATTHEW W. LUTZ**
Fox & Lutz
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE ADOPTION OF: | ) |
| | ) |
| I.B. AND W.B., (Minor Children) | ) |
| | ) |
| AND | ) |
| B.B., | ) |
| | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )  No. 82A05-1402-AD-65 |
| | ) |
| B.C. & J.L., | ) |
| | ) |
| Appellees (Adoptive parents/Petitioner) | ) |
| | ) |
| AND | ) |

THE INDIANA DEPARTMENT OF CHILD                )
SERVICES,                                       )
                                                )
    Co-Appellee-Petitioner.                  )
                                                )

APPEAL FROM THE  VANDERBURGH SUPERIOR COURT 1
The Honorable Brett J. Niemier, Judge
The Honorable Renee Allen Ferguson, Magistrate
Cause No.
82D07-1302-AD-22
82D07-1302-AD-23

**October 28, 2014**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Appellant, the paternal grandmother of I.B. and W.B., appeals the grant of maternal grandmother and her fiancé's (collectively referred to as Adoptive Parents) petitions to adopt I.B. and W.B.  Appellant presents the following expanded and restated issues for review:

    1.    Were Adoptive Parents statutorily barred from adopting the children?

    2.    Is the adoption order supported by sufficient evidence?

    3.    Was Appellant improperly denied full consideration and services by
        the Indiana Department of Child Services (DCS) resulting in the lack
        of a complete adoptive placement investigation?

We affirm.

Mother and Father are the biological parents of I.B. and W.B., boys born in May 2011 and April 2009, respectively.  Mother also has two older biological sons, J.C. and G.C., who were born in November 2002 and February 1999.  The four minor children were

removed by the Vanderburgh County DCS in May 2011, following I.B.'s premature birth. I.B. was born with drugs in his system and with severe health concerns, and Mother tested positive for drugs. W.B., who was two at the time, was malnourished. Further, J.C. suffered (and still does) from post-traumatic stress disorder and other psychological issues resulting from witnessing substantial domestic violence against his mother. Both Mother and Father were methamphetamine users, and Father had been in and out of prison.

Upon their removal and CHINS adjudication, the three older children were placed in the home of their maternal grandmother and her fiancé (whom she had lived with for thirteen years). I.B. remained in the hospital, eventually being transferred to Riley Children's Hospital in Indianapolis. After about five months, placement of the three children was changed to Appellant's home because Adoptive Parents both tested positive for marijuana use. The three children stayed with Appellant and her daughter for about five weeks before being sent back to Mother's home for a trial home visit upon I.B.'s release from the hospital.[1] All four children were eventually removed and placed in foster care, with I.B. and W.B in one foster home and J.C. and G.C. in another.

Adoptive Parents promptly filed for change of placement to have all four children under their care and "made significant changes in their lives to adapt to the children's needs." *Appellant's Appendix* at 142. Adoptive Parents worked closely with DCS, service providers, and the foster families and submitted to random drug screens, passing them all. They also obtained extensive training to learn how to care for I.B.'s special needs,

---

[1] Accordingly, I.B. was never placed in Appellant's home.

3

including his G-tube. Placement was transferred to Adoptive Parents around January 2013. I.B. and W.B. have remained under their care, along with their brothers,[2] since that time. I.B. and W.B. have thrived under the care of Adoptive Parents.

With termination of Mother and Father's parental rights on the horizon, Adoptive Parents filed a petition for adoption of all four children on February 20, 2013. Mother consented to the adoption. On March 12, Appellant filed petitions to intervene and cross-petitions for adoption of I.B. and W.B. Mother and Father's parental rights were terminated in September. Adoptive Parents' petitions with respect to J.C. and G.C. were granted on October 8, 2013, and the contested adoption hearing regarding I.B. and W.B. was held on October 30 and November 4, 2013.

At the adoption hearing, the CASA and the DCS family case managers each testified that adoption by Adoptive Parents was in I.B. and W.B.'s best interests. All felt that keeping the four brothers together was of prime importance. The current family case manager, Christy Skie (FCM Skie), testified: "The sibling bond is remarkable to me. These kids, that's all they've really known is each other. I couldn't fathom taking them away from their brothers. I think the impact on all four children would be detrimental if they were separated." *Transcript Addendum* at 63. Similarly, the CASA testified, "I feel very strongly that the four boys need to be together." *Id.* at 38. She also noted in a report to the court that allowing the adoption "would permit these boys to keep their remaining family intact." *Appellant's Appendix* at 198.

---

[2] J.C. has spent time at an inpatient treatment facility to deal with his psychological issues.

In addition to the sibling bond, witnesses also emphasized the strong connection I.B. and W.B. had with Adoptive Parents, with whom they have had a relationship since birth. Moreover, testimony and reports from service providers, the CASA, and the FCM overwhelmingly indicated that Adoptive Parents offered a loving and safe environment for the children and that they were well equipped to care for I.B.'s special needs, along with the needs of the other children. Indeed, Adoptive Parents had established an exceptional reputation with I.B.'s regular therapy and service providers, and I.B. was progressing faster than expected.[3]

Evidence was also submitted at the hearing regarding maternal grandmother's 1997 conviction for class D felony neglect of a dependent. Mother was the victim in that case. Maternal grandmother pleaded guilty shortly after being charged, admitting that she had left her minor daughter alone with her husband (the child's father) after becoming aware that he had been sexually molesting the child. In exchange for her guilty plea, maternal grandmother received a two-year suspended sentence. She successfully completed probation and family counseling, as well as divorced her husband of eighteen years, the perpetrator. At the hearing, FCM Skie explained that she had spoken in detail with

---

[3] I.B. has doctor appointments (some in Indianapolis) and in-home therapy sessions on a regular basis. Adoptive Parents have accommodated this rigorous schedule and have remained diligent with I.B.'s therapy between sessions. FCM Skie summarized the child's progress during her testimony:

> [I.B.'s] thriving in their home. The progress I've seen with him is just amazing. When I got the case they didn't think he'd be able to walk. They didn't think he'd be talking. He's almost walking now. He's talking on a regular basis when I go out there. The hopes are in the future that he could have his G-tube removed and that he would be able to eat and sustain with oral food. I think a lot of that has to do with the work and effort that [Adoptive Parents] have put into that.

*Transcript Addendum* at 63-64. In her report to the court, FCM Skie indicated that Adoptive Parents "have ensured that [I.B.] has had all of his needs met." *Appellant's Appendix* at 157. She concluded her report: "[I.B.] has come a long way in a short period of time, and he continues to improve daily." *Id*. at 158.

maternal grandmother about the conviction, as well as read the police reports. FCM Skie testified that she had no concern that maternal grandmother posed a risk to the children in light of this sixteen-year-old conviction. Moreover, FCM Skie noted that the victim in that case, Mother, consented to the adoption.

On January 14, 2014, the juvenile court entered orders granting Adoptive Parents' petitions for adoption of I.B. and W.B. and denying Appellant's cross-petitions for adoption. The court issued extensive findings of fact and then concluded that adoption by Adoptive Parents was in I.B. and W.B.'s best interests, explaining its conclusion as follows:

5.  Many factors are taken into account in this decision but the Court cannot overlook the sibling relationship between [I.B., W.B., G.C. and J.C.]

6.  The closest family members to [I.B. and W.B.], [G.C. and J.C.] are already the children of [Adoptive Parents]. Living in a stable household with parents that have proven themselves as caregivers is preferable to [I.B. and W.B.] interacting with their siblings on a visitation schedule.

7.  [Adoptive Parents] provide the atmosphere where sibling bonds can flourish and serve the best interests of all four siblings; allowing them to develop a positive personal identity and self-esteem.

8.  The importance of these relationships cannot be fully realized with even frequent, post-adoptive contact between [siblings]. In fact, that arrangement may hinder their development and raise even more questions about personal identity for them to struggle with through life.

9.  The Court concludes that [maternal grandmother's] criminal history is not dispositive of her ability to care for children. That is not to say the Court cast this evidence aside. There was testimony from [maternal grandmother] and [FCM] Skie regarding this issue and the documentation pertaining to the 1997 conviction was made a part of the record. The explanation given by [maternal grandmother] regarding the conviction and the overwhelming amount of confidence the FCM's [sic] and the CASA have in [her] suitability as a caregiver cannot be overlooked in consideration of this evidence. Nor can

6

[Mother's] consent for her mother to adopt, as she was the alleged victim in that case.

10. There was no other evidence offered to suggest that [Adoptive Parents] wouldn't be able to successfully raise all four children in a safe, secure, loving child friendly environment. Quite the contrary, both FCM's [sic], the CASA and the therapy providers all testified that [Adoptive Parents] were doing very well, that both [I.B. and J.C.] with special needs are making great progress, and that the all [sic] four children are happy.

*Appellant's Appendix* at 27-28. Appellant now appeals.

1.

Appellant contends that Adoptive Parents were barred from adopting due to their prior felony convictions. She specifically argues that although the disqualifying convictions were waived for blood-relative placement during the CHINS proceedings, the court was barred from granting the adoption petition pursuant to Ind. Code Ann § 31-19-11-1(c) (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session & Second Regular Technical Session of the 118th General Assembly).

I.C. § 31-19-11-1(c) provides in relevant part:

[T]he court may not grant an adoption if a petitioner for adoption has been convicted of any of the felonies described as follows:
    (1)  Murder (IC 35-42-1-1).
    (2)  Causing suicide (IC 35-42-1-2).
    (3)  Assisting suicide (IC 35-42-1-2.5).
    (4)  Voluntary manslaughter (IC 35-42-1-3).
    (5)  Reckless homicide (IC 35-42-1-5).
    (6)  Battery as a felony (IC 35-42-2-1).
    (7)  Domestic battery (IC 35-42-2-1.3).
    (8)  Aggravated battery (IC 35-42-2-1.5).
    (9)  Kidnapping (IC 35-42-3-2).
    (10) Criminal confinement (IC 35-42-3-3).
    (11) A felony sex offense under IC 35-42-4.
    (12) Carjacking (IC 35-42-5-2) (repealed).
    (13) Arson (IC 35-43-1-1).

(14) Incest (IC 35-46-1-3).

(15) Neglect of a dependent (IC 35-46-1-4(a)(1) and IC 35-46-1-4(a)(2)).

(16) Child selling (IC 35-46-1-4(d)).

(17) A felony involving a weapon under IC 35-47 or IC 35-47.5.

(18) A felony relating to controlled substances under IC 35-48-4.

(19) An offense relating to material or a performance that is harmful to minors or obscene under IC 35-49-3.

(20) A felony under IC 9-30-5.

(21) A felony under the laws of another jurisdiction, including a military court, that is substantially equivalent to any of the offenses listed in subdivisions (1) through (20).

However, the court is not prohibited from granting an adoption based upon a felony conviction under subdivision (6), (10), (12), (13), (17), (18), or (20) or its equivalent under subdivision (21), if the date of the conviction did not occur within the immediately preceding five (5) year period.

Maternal grandmother has a conviction from 1997 for class D felony neglect of a dependent, which falls under subdivision (15) above and is not subject to the discretionary provision applicable to certain other enumerated prior felonies that are more than five years old. Accordingly, the statute makes clear that the court was prohibited from granting the adoption in her favor.[4]

DCS, as co-appellee, urges that "the purposes and policy of Indiana's adoption law would not be promoted by a strict application [of the statute] under the circumstances of this case." *Co-Appellee's Brief* at 20. Specifically, DCS argues that application of the statute's irrebuttable presumption of unfitness would result in a violation of the children's due process rights. Appellant does not respond to this argument.

---

[4] The same cannot be said for her fiancé. The record is imprecise regarding his criminal past, but it appears that he has out-of-state felony convictions that are more than twenty years old. He indicated at the hearing that he had two burglary convictions in Illinois and an armed robbery conviction in Iowa. These long-ago crimes do not statutorily preclude him from adopting.

8

It is well established that "the best interest of the child is the paramount concern in any adoption case." *In re Adoption of S.A.*, 918 N.E.2d 736, 742 (Ind. Ct. App. 2009), *trans. denied. See also In re Adoption of K.S.*, 980 N.E.2d 385, 389 (Ind. Ct. App. 2012) ("[t]he purpose of Indiana's adoption statutes is to protect and promote the welfare of children by providing them with stable family units").  The evidence overwhelmingly establishes in this case that it is in I.B. and W.B.'s best interests to be adopted by Adoptive Parents and remain in this loving, intact family unit along with their older half-brothers. Appellant would have us close our eyes to this evidence and apply the irrebuttable presumption set out in the statute – that is, individuals convicted of certain enumerated felonies are per se unfit to adopt.  Although in many cases this presumption may be apt, it is not in all, and the United States Supreme Court has warned that "[s]tatutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." *Vlandis v. Kline*, 412 U.S. 441, 446 (1973).

In *Stanley v. Illinois*, 405 U.S. 645 (1972), the Supreme Court found unconstitutional an irrebuttable statutory presumption that all unmarried fathers were unqualified to raise their children.  The court explained in part:

> Procedure by presumption is always cheaper and easier than individualized determination.  But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child.  It therefore cannot stand.

9

*Id*. at 656-57.[5]

Like the father in *Stanley*, I.B. and W.B. have a cognizable and substantial interest at stake. In *In re Adoption of Jonee*, 695 N.Y.S.2d 920 (N.Y. Fam. Ct. 1999), a New York court identified the liberty interest as "the right of all members of an intact, biological, extended family to continue residing as a family unit". *Id*. at 923.[6] Similarly, we conclude that children such as I.B. and W.B. have a liberty interest in preserving the integrity and stability of their existing familial relationship and are entitled to be free from arbitrary state action affecting that relationship.

In sum, we conclude that I.B. and W.B. were entitled to an individualized determination of their best interests before being removed from the intact, biological family unit in which they had lived since the beginning of 2013. This is precisely the procedure that was provided below, and the evidence established that despite maternal grandmother's prior conviction, it was in I.B. and W.B.'s best interests to be adopted into this loving, secure home in which they have thrived and which is made up of family members with whom they are closely bonded. Under these circumstances, the statute is unconstitutional as applied and maternal grandmother's conviction cannot be dispositive.

---

[5] We recognize that the Supreme Court has retreated to some extent from the irrebuttable presumption doctrine since *Vlandis* and *Stanley*, but we still find it applicable to interests that enjoy constitutionally protected status. *See Weinberger v. Salfi*, 422 U.S. 749 (1975) (observing that unlike the claim in *Stanley*, "a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status").

[6] Other New York courts have found a similar constitutionally protected right requiring an individualized determination in certain fact-specific cases (that is, where the child is already living with and closely bonded to the person with the disqualifying criminal conviction). *See In re Adoption of Abel*, 931 N.Y.S.2d 829 (N.Y. Fam. Ct. 2011); *In re Adoption of Corey*, 707 N.Y.S.2d 767 (N.Y. Fam. Ct. 1999). *Cf. In re H.K.*, 159 Cal. Rptr. 3d 144, 152 (Cal. Ct. App. 2013) (discussing each of these New York cases but distinguishing them because prospective adoptive parent in this case, while biologically related to child, had not lived with child in a "bonded, quasi-family relationship").

2.

Appellant argues that even if Adoptive Parents are not statutorily barred from adopting, "the evidence does not lead to the conclusion that [their petition] should be granted." *Appellant's Brief* at 17. She casts Adoptive Parents as "convicted felons with drug problems" and asserts that placing both I.B. and J.C. with Adoptive Parents would be too burdensome because these two brothers have "the most severe physical and emotional problems". *Id.* Further, she claims that her living and financial conditions are not dramatically different than Adoptive Parents'.

On appeal from the grant of an adoption petition, we consider only the evidence and reasonable inferences most favorable to the trial court's decision to determine whether the evidence is sufficient. *In re Adoption of S.A.*, 918 N.E.2d 736. "We will not disturb the trial court's decision in an adoption proceeding unless the evidence at trial led to but one conclusion and the trial court reached an opposite conclusion." *Id.* at 741.

We reject Appellant's request for us to reweigh the evidence. As set out above, the evidence (most notably, testimony and reports from the DCS FCMs and the CASA) overwhelmingly established that adoption by Adoptive Parents and continuation of the intact, biological family unit in which I.B. and W.B. had thrived alongside their brothers was in their best interests. Appellant's claim that nothing in the record casts her in a bad light, while essentially true, does not change this calculation.

3.

Finally, Appellant makes a general claim that she was unfairly excluded from the placement/adoption process by DCS and the CASA. Appellant asserts that DCS

11

investigations to determine the children's best interests ignored the potential for placement with her and prejudiced her chance to adopt I.B. and W.B. She notes that the CASA and FCM Skie had never been to her home and never observed her regular visits with the children and, therefore, did not complete a thorough investigation regarding adoptive placement.

Appellant misconstrues DCS's role. It was not to assist Appellant in her pursuit to obtain custody of I.B. and W.B., nor was it to provide Appellant with the full plethora of services that were made available to Adoptive Parents, who sought and obtained custody of the children out of foster placement during the CHINS proceedings. DCS's role was to find a suitable adoptive home for the children and assist the trial court in determining the children's best interests. *See In re Adoption of N.W.R.*, 971 N.E.2d 110 (Ind. Ct. App. 2012). Further, pursuant to I.C. § 31-19-8-6 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session & Second Regular Technical Session of the 118th General Assembly), DCS had an obligation to file an adoptive placement report with the trial court. DCS satisfied this obligation. Moreover, had Appellant argued below and the court agreed that more investigation was needed, it would have continued that case pursuant to I.C. § 31-19-8-7 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session & Second Regular Technical Session of the 118th General Assembly).

The sum of Appellant's claim appears to be that DCS's failure to fully investigate placement with her resulted in a denial of due process. She provides no relevant authority in support, and we find her vague assertion of a due process violation unavailing.

12

Judgment affirmed.

VAIDIK, C.J., and MAY, J., concur.