ATTORNEYS FOR APPELLANT
Steven E. Ripstra
Melissa Jo Haley
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Christina D. Pace
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
B.C. AND J.L.
Julie Fox
Matthew W. Lutz
Fox & Lutz, LLC
Evansville, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 82S05-1502-AD-63

**FILED**
Jun 11 2015, 2:32 pm
CLERK
of the supreme court,
court of appeals and
tax court

IN THE MATTER OF THE ADOPTION OF MINOR CHILDREN: I.B. AND W.B.:

B.B.,

*Appellant (Cross-Petitioner/Intervenor),*

V.

B.C. AND J.L.,

*Appellees (Adoptive Parents/Petitioners),*

AND

INDIANA DEPARTMENT OF CHILD SERVICES,

*Co-Appellee (Wardship of I.B. and W.B.).*

_____

Appeal from the Vanderburgh Superior Court, Nos. 82D07-1302-AD-22 and 82D07-1302-AD-23
The Honorable Renée Allen Ferguson, Magistrate
The Honorable Brett J. Niemeier, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 82A05-1402-AD-65

_____

**June 11, 2015**

**Rush, Chief Justice.**

After I.B. and W.B. were removed from their parents, both grandmothers petitioned to adopt them. The trial court permitted the maternal grandmother and her fiancé to adopt the children—even

though the maternal grandmother has a prior felony conviction that statutorily disqualifies her from adopting—and the paternal grandmother appealed. The Court of Appeals affirmed, holding the statutory disqualification unconstitutional as applied because it created an "irrebuttable presumption" that blocked consideration of the children's best interests.

We disagree with that analysis. The United States Supreme Court has left its "irrebuttable presumption" cases lying dormant for several decades. And under its more recent "classification" analysis, the statute's regrettable consequences under the facts of this case establish no as-applied constitutional violation. We therefore reverse the trial court and remand to reconsider both adoption petitions to the extent they are statutorily permissible, receiving supplemental evidence if it chooses.

### Facts and Procedural History

In May of 2011, toddler W.B. and newborn I.B.—and also their early adolescent half-brothers J.C. and G.C.—were removed from their home because I.B. tested positive at birth for marijuana and the mother tested positive for methamphetamine. I.B. also has extensive special medical needs, including cerebral palsy and a gastrostomy tube ("G-tube"), and was hospitalized for the first six months of his life. All four were eventually adjudicated to be children in need of services (CHINS).

From May until October of 2011, the three oldest children were placed in the home of their maternal grandmother, B.C. ("Maternal Grandmother"), and her fiancé, J.L. ("Fiancé"), while I.B. stayed in the hospital. But then Maternal Grandmother and Fiancé tested positive for marijuana and were initially uncooperative with services, so W.B. was briefly placed with his paternal grandmother, Appellant B.B. ("Paternal Grandmother"). Around Thanksgiving 2011, I.B. was released from the hospital, and all four children were returned to their mother and W.T.B. (W.B. and I.B.'s father) for a trial home visit. But the trial home visit failed, and the children went to two different foster homes—the older children in one, and W.B. and I.B. in another.

Then in mid-2012, the children—first the older two, then W.B., and finally I.B.—transitioned back to Maternal Grandmother and Fiancé, who petitioned to adopt all four of them with the mother's consent.[1] The older boys' adoption was uncontested and was granted in early October 2013. But Paternal Grandmother cross-petitioned to adopt W.B. and I.B., and the court heard testimony in a

---

[1] The older boys' father is deceased, and the trial court found W.T.B.'s consent was not required under Indiana Code section 31-19-9-8(a) (2008).

two-day-long contested hearing. We summarize that evidence in the light most favorable to the trial court's findings and judgment.

*Maternal Grandmother's and Fiancé's Home and Relationship with the Children*

The Department of Child Services (DCS) and Court Appointed Special Advocate (CASA) recommended adoption by Maternal Grandmother and Fiancé instead of Paternal Grandmother. Maternal Grandmother and Fiancé had proactively sought out G-tube training early in the case. And they also (along with the older siblings) use playtime to reinforce aspects of I.B.'s physical therapy, so that I.B.'s mobility and speech have far exceeded providers' expectations. The success Maternal Grandmother and Fiancé had in handling I.B.'s special needs echoes their similar success in helping his half-brother J.C. manage his special emotional needs through anger-management strategies and seeking out appropriate inpatient treatment when it was warranted.

Furthermore, all four siblings are closely bonded with each other—especially I.B. with G.C., and W.B. with J.C. Likewise, W.B. and I.B. (like the older two) are strongly bonded with Maternal Grandmother and Fiancé. For example, even with I.B.'s limited speech, he enthusiastically greets Fiancé as "Buddy." Their home has three bedrooms. And because Maternal Grandmother and Fiancé work different schedules, they need third-party childcare only three half-days per week, and both their employers offer significant flexibility for accommodating I.B.'s frequent doctor appointments. Finally, DCS and CASA in their recommendations emphasized the importance of preserving the sibling relationship between the four children, believing it would be detrimental to all four children if I.B. and W.B. were separated from the older boys.

Maternal Grandmother and Fiancé both testified candidly about their prior marijuana use and initial hostility to cooperating with DCS after the children's removal—as well as their change of heart and renewed focus on providing what the children needed. At first, when Maternal Grandmother tested positive for marijuana, Fiancé refused to consent to testing until several weeks later, and both were initially uncooperative with services offered by DCS. But they relented, and each began substance-abuse counseling as referred by DCS. After counseling identified no dependency on illegal substances, however, they both declined further services because the sessions were expensive. At the hearing, both Maternal Grandmother and Fiancé admitted they had occasionally used marijuana (Fiancé more frequently), but had stopped using and had been drug-free for nearly two years, confirmed by random testing. Their conduct had persuaded the family case manager that "they turned their mindsets around . . . that they needed to be in this for the children."

*Paternal Grandmother's Home and Relationship with the Children*

By contrast, even though Paternal Grandmother undisputedly had a good relationship with I.B. and W.B., DCS and CASA had reservations about her as an adoptive parent. The trial court's findings reflect that she had been passive and disengaged during the CHINS case, never obtaining G-tube training, nor attempting to do so until it became an issue in the case. As a working single parent, she would need to rely heavily on third-party childcare, but had not adequately investigated her options—even though childcare would be particularly challenging because any provider would also need G-tube training. She had struggled to meet J.C.'s special needs during the brief time the children were in her home, and at least once had lacked adequate food. And her home and her work schedule are generally less-suited to raising children—her home has only two bedrooms, her ability to take even important phone calls at work is restricted, and her schedule is rigid (with only five days' paid leave per year) so that accommodating I.B.'s frequent medical appointments would be difficult.

But the trial court's greatest concern, reflected three times in its findings, was with Paternal Grandmother's poor judgment about her son W.T.B.—I.B. and W.B.'s father and the other children's stepfather. The record amply supports the court's concern: J.C.'s special emotional needs stem from witnessing W.T.B.'s domestic violence against the children's mother. In particular, in the fall of 2012, W.T.B. had beaten her so severely she could barely breathe and needed emergency medical care. Afterward, Paternal Grandmother arrived at the scene of the beating (a motel where the parents were living together despite a no-contact order), but did not call the police. As she testified, "It never crossed my mind. Didn't think about it. They both had been drinking and I just wanted the situation to become peaceful." Rather, Maternal Grandmother and Fiancé reported the beating to authorities, after the mother showed up severely injured at their home and they took her to the hospital. Once before that, as well, Paternal Grandmother had briefly allowed the parents to live together with her despite her knowledge of the protective order. The court's findings reflect concern that she would permit the children to have detrimental contact with the father, while failing to preserve their relationship with Maternal Grandmother and Fiancé.

*Maternal Grandmother's and Fiancé's Criminal History*

Complicating the trial court's best-interests analysis, both Maternal Grandmother and Fiancé had felony convictions from fifteen or more years prior. In 1989, Fiancé was convicted of armed robbery in Iowa, and had also been convicted of burglary twice in Illinois, serving prison

4

time in both states. And in 1997, Maternal Grandmother had pleaded guilty to Class D felony neglect of a dependent, resulting in a two-year suspended sentence, for failing to report her ex-husband's molestation of her daughter (the children's mother). DCS and CASA were aware of those convictions but had no concerns about how well either of them could raise the children—and indeed, DCS had formally waived any disqualifying effect of Fiancé's convictions. But as DCS's written report acknowledged, Maternal Grandmother's neglect conviction was disqualifying by statute and could not be waived. See Ind. Code § 31-19-11-1(c)(15) (2008). Both Maternal Grandmother and Fiancé testified on direct and cross-examination about their criminal histories, but none of the parties specifically argued (nor included in their proposed orders) that Maternal Grandmother's conviction was an absolute bar.

*Trial Court's Order*

The trial court entered sua sponte findings of fact and conclusions of law. In essence, it found that it was in the best interests of I.B. and W.B. for Maternal Grandmother and Fiancé to adopt them, based partly on their success in working with I.B.'s special needs and the desirability of keeping all four siblings in the same home. One of its conclusions of law specifically addressed Maternal Grandmother's neglect conviction:

> The Court concludes that [Maternal Grandmother]'s criminal history is not dispositive of her ability to care for children. That is not to say the Court cast this evidence aside. There was testimony from [Maternal Grandmother] and [the family case manager] regarding this issue and the documentation pertaining to the 1997 conviction was made a part of the record. The explanation given by [Maternal Grandmother] regarding the conviction and the overwhelming amount of confidence the [case managers] and the CASA have in [Maternal Grandmother]'s suitability as a caregiver cannot be overlooked in consideration of this evidence. Nor can [the mother]'s consent for [Maternal Grandmother] to adopt, as she was the alleged victim in that case.

The court accordingly granted adoption to Maternal Grandmother and Fiancé, and denied Paternal Grandmother's petition. Paternal Grandmother appealed.

*Court of Appeals Disposition*

In the Court of Appeals, Paternal Grandmother for the first time directly argued that under Indiana Code section 31-19-11-1(c)(15), Maternal Grandmother and Fiancé are barred from adopting

because of their disqualifying felony convictions. In response, Maternal Grandmother and Fiancé argued that the best-interests analysis favored them, that Fiancé's convictions were not an absolute bar because they were more than five years old, and that the court specifically determined that Maternal Grandmother's conviction was not dispositive. DCS also filed a response brief, arguing that the statutory bar on Maternal Grandmother's adoption constituted an "irrebuttable presumption" that, as applied, would violate the due process rights of Maternal Grandmother, Fiancé, and the children, and would also frustrate the overall best-interests purposes of the adoption statutes.

The Court of Appeals affirmed in a unanimous published opinion. In re Adoption of I.B. and W.B., 19 N.E.3d 784 (Ind. Ct. App. 2014). Echoing DCS's argument, the Court held the statute unconstitutional as applied, amounting to an irrebuttable presumption in violation of due process. Id. at 790–91 (citing Stanley v. Illinois, 405 U.S. 645, 656–57 (1972) and In re Adoption of Jonee, 695 N.Y.S.2d 920 (N.Y. Fam. Ct. 1999)). Upholding the trial court's determination that adoption by Maternal Grandmother and Fiancé was in the children's best interests, the Court affirmed the adoption.

Paternal Grandmother sought transfer, which we granted, thus vacating the Court of Appeals opinion. We now hold the statute constitutional, despite its harsh consequences under these facts, and remand to the trial court to reconsider the petitions in view of the absolute statutory bar.

## Standard of Review

Because neither party filed a written request for findings and conclusions, see Ind. Trial Rule 52(A), the trial court's findings are controlling only as to issues they cover. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). We limit our review of those matters to whether the evidence supports the findings and then whether the findings support the judgment, reversing the findings only if they are clearly erroneous. Id. On all other matters, the general-judgment standard applies, and we will affirm on any legal theory supported by the evidence. Id. But the trial court's conclusions of law, Johnson v. Johnson, 999 N.E.2d 56, 59 (Ind. 2013)—and any constitutional challenges, Lock v. State, 971 N.E.2d 71, 74 (Ind. 2012)—are reviewed de novo.

## Discussion

Our as-applied constitutional analysis of Indiana Code section 31-19-11-1(c) begins "with a strong presumption of constitutionality," so that "every doubt must be resolved in favor of [the

statute's] validity." Girl Scouts of S. Ill. v. Vincennes Ind. Girls, Inc., 988 N.E.2d 250, 255 (Ind. 2013). The party challenging the statute must clearly overcome that presumption by a contrary showing. Hubbard v. State, 849 N.E.2d 1165, 1169 (Ind. Ct. App. 2006), trans. denied. And as discussed below the challengers have not carried that burden.

## I. Indiana Code Section 31-19-11-1 Is Constitutional Because Its Prohibitions Are Rationally Related to the Classifications They Draw.

The Court of Appeals characterized the statutory bar on adoptions by certain convicted felons as an "irrebuttable presumption" that infringes on the children's "cognizable and substantial . . . liberty interest in preserving the integrity and stability of their existing familial relationship." I.B., 19 N.E.3d at 790–91 (citing Stanley, 405 U.S. 645 and Jonee, 695 N.Y.S.2d 920). In reaching that conclusion, the Court quoted Vlandis v. Kline, 412 U.S. 441, 446 (1973) that "'[s]tatutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments.'" I.B., 19 N.E.3d at 790 (alteration in original). The Court of Appeals "recognize[d] that the Supreme Court has retreated to some extent from the irrebuttable presumption doctrine since Vlandis and Stanley," but held it is "still . . . applicable to interests that enjoy constitutionally protected status." Id. at 790 n.5 (citing Weinberger v. Salfi, 422 U.S. 749 (1975)). On that basis, it "conclude[d] that I.B. and W.B. were entitled to an individualized determination of their best interests" before being removed from Maternal Grandmother and Fiancé, rendering the statute unconstitutional as applied to them—relying on Jonee and other New York cases reaching a similar conclusion. Id. at 791 & n.6 (collecting New York cases). The Court of Appeals' inclination to keep the siblings together in the only long-term home they have ever known is eminently understandable, but its rationale cannot be squared with controlling Supreme Court precedent.

First, even if an "irrebuttable presumption" analysis is "still . . . applicable to interests that enjoy constitutionally protected status" as the Court of Appeals concluded, id. at 790 n.5, "the Due Process Clause affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental." Michael H. v. Gerald D., 491 U.S. 110, 122 (1989) (plurality opinion) (internal quotation marks omitted). And so in Stanley, the high Court invalidated a statute that specifically singled-out the father-child relationship, 405 U.S. at 657–59, which certainly "rank[s] as fundamental," Michael H., 491 U.S. at 122. But the statute here does not target a "fundamental" right—rather, the complaint is that it lacks a generalized best-interests exception, and therefore interferes as-applied with the boys' sibling and family relationship. Of course, the

children's best interests are paramount in any adoption, and sibling relationships, especially here, are extraordinarily valuable and a weighty best-interests factor. But declaring that the statute's lack of an *ad hoc* best-interests exception violates Due Process would effectively elevate best interests, and each of its infinite factual variations, into a constitutional doctrine. That is a step we are unwilling to take.

And more fundamentally, the United States Supreme Court has tacitly abandoned[2] the "irrebuttable presumption" doctrine, which "was a strange hybrid of 'procedural' due process and equal protection invented by the Supreme Court in the early 1970s, and laid to rest soon after." Brennan v. Stewart, 834 F.2d 1248, 1258 (5th Cir. 1988) (citing Vlandis as "applying the doctrine" and Weinberger, 422 U.S. 749 as "effectively overruling" Vlandis). Instead, as the high Court explained in Michael H., "'irrebuttable presumption' cases must ultimately be analyzed as calling into question not the adequacy of procedures but—like our cases involving classifications framed in other terms—the adequacy of the 'fit' between the classification and the policy that the classification serves." 491 U.S. at 121 (citations omitted).

Under that "classification" analysis, there is no constitutional defect in barring adoptions by petitioners with felony child-neglect convictions. I.C. § 31-19-11-1(c)(15). Statutory classifications that neither violate a fundamental right nor discriminate against a suspect class are reviewed only for "whether the statute is rationally related to legitimate legislative goals." Lindley for Lindley v. Sullivan, 889 F.2d 124, 132 (7th Cir. 1989). But "there is no fundamental right to adopt" because the adoption process depends on so many variables, id. at 131—and convicted felons are not a protected class, Baker v. State, 747 N.E.2d 633, 638 (Ind. Ct. App. 2001), trans. denied. Distinguishing between convicted child-neglect felons and non-felons is rationally related to the legitimate legislative goal of ensuring that children will not be adopted into a neglectful home—and so the consequences of that distinction here, though regrettable, are not unconstitutional.[3]

---

[2] Though the Supreme Court has never expressly overruled Vlandis, it has not invalidated a statute under Vlandis since United States Dep't of Agric. v. Muerry, 413 U.S. 508 (1973), over forty years ago. People v. Wildman, 858 N.Y.S.2d 504, 509 (N.Y. Crim. Ct. 2008). So while we would follow Vlandis or Stanley if they were directly controlling, we will not *expand* them when the high Court has conspicuously declined to do so.

[3] Accordingly, we do not find Jonee, 695 N.Y.S. at 923–25, or other similar New York cases to be persuasive. See I.B., 19 N.E.3d at 790–91 & n.6 (collecting New York cases).

A final point warrants mention. We recognize I.B.'s and W.B.'s crucial interest in remaining in the same home as their older brothers, preserving their sibling bond as fully as possible. But that relationship is jeopardized here only because the *older* children's adoption, though uncontested, also violated this statute. In other words, the siblings' dilemma is caused not by enforcing the statute now, but by disregarding it previously. That irregularity has now caused serious collateral consequences for I.B. and W.B.—but it does not give them a due process right to be adopted in violation of the same statute. Rather, it demonstrates why, even in unopposed proceedings, courts must be vigilant not to overlook any controlling law.

## II. The Trial Court Must Reconsider the Children's Best Interests in Light of Indiana Code Section 31-19-11-1's Restrictions.

Having determined that Indiana Code section 31-19-11-1(c) is not unconstitutional as applied, and therefore bars Maternal Grandmother from adopting the children, we must determine the appropriate remedy. Paternal Grandmother argues that even apart from the statutory violation, the evidence did not support granting Maternal Grandmother's and Fiancé's petition, and that instead her own petition should be granted on appeal. In response, Maternal Grandmother and Fiancé argue that the adoption may be affirmed as to Fiancé even if it is reversed as to her. But instead, we vacate the trial court's rulings on both petitions and remand to give the trial court the first opportunity to reconsider which of those alternatives—if any—is in the children's best interests.

First, even though the evidence presented could have *supported* a conclusion in Paternal Grandmother's favor, by no means did it *compel* that result. To the contrary, apart from the statutory bar, there would have been ample evidence for us to affirm that adoption by Maternal Grandmother and Fiancé was in the children's best interests. Some of those considerations, such as keeping the siblings together and the larger home, would also hold true for Fiancé individually— and certainly there was substantial evidence that all of the children, especially I.B., have a closely bonded relationship with him. But on the other hand, the children's mother consented to adoption by Maternal Grandmother and Fiancé, and might not have consented to Fiancé adopting alone with no legal bond between him and Maternal Grandmother. In sum, we simply cannot know how the trial court might have weighed those considerations if it knew its choices were limited to either Fiancé alone or else to Paternal Grandmother.

Indeed, the trial court did not face an either-or choice—we must also consider that it might have denied *both* petitions. Though the permanency of adoption is usually in a child's best interests,

9

the risk of separating the siblings might have persuaded the court that under these circumstances, a non-adoptive placement would better serve the children's best interests. For example, it might have encouraged Maternal Grandmother and Fiancé to pursue a joint guardianship[4] since a joint adoption was statutorily impermissible. See In re Adoption of J.L.S., 908 N.E.2d 1245 (Ind. Ct. App. 2009) (trial court found adoption was barred by Indiana Code section 31-19-11-1, but awarded custody for 60 days to prospective adoptive parents, and requested that they file a guardianship petition; Court of Appeals reversed on grounds that the parent had not been "convicted" of a disqualifying offense). It is only proper to remand for the trial court to make the first choice among its many options.

Finally, we note that the trial court on remand need not limit itself to the evidence it heard a year and a half ago. If, for example, either family's housing or employment circumstances—both of which were significant factors in the trial court's decision—have changed, it would be appropriate to consider new evidence in that regard. Likewise, even Maternal Grandmother's disqualifying felony conviction is not necessarily etched in stone, since it may be possible (though we express no legal opinion) for her to expunge it under Indiana Code 35-38-9 (2014), convert it to a misdemeanor under Indiana Code section 35-50-2-7(d),[5] or otherwise seek some form of post-conviction relief— any of which could potentially "re-qualify" her to adopt. We are therefore unwilling to declare what is in the children's best interests today on the basis of a dry record developed in 2013. To ensure the trial court can fully reconsider I.B.'s and W.B.'s best interests in light of this opinion, we reverse and remand the trial court's orders on both adoption petitions. On remand, the trial court shall reconsider the cross-petitions consistent with this opinion, including whether a non-adoptive placement may currently be in the children's best interests and by receiving supplemental evidence if the trial court chooses to do so.

**Conclusion**

Under the circumstances of this case, Indiana Code section 31-19-11-1(c) regrettably bars an adoption that, to all appearances, would otherwise be in I.B. and W.B.'s best interests. But that

---

[4] Maternal Grandmother's neglect conviction is not a bar to guardianship; instead, only certain sex-crime convictions (of which she has none) are disqualifiers for guardianship. I.C. § 29-3-7-7 (Supp. 2014).

[5] Just as Indiana Code section 35-50-2-7(c) gives criminal courts discretion at sentencing to enter an A-misdemeanor conviction on what would otherwise be a Class D felony, part (d) of the statute gives them discretion to do so retroactively. The conversion is not mandatory—but any relief granted under this statute would eliminate Maternal Grandmother's statutory disqualification.

does not make the statute unconstitutional as applied, because its prohibitions are rationally related to a legitimate legislative purpose and do not discriminate against a suspect class. We therefore reverse the trial court's judgment on both adoption petitions and remand with instructions to vacate the adoption decree within thirty days of this Court's opinion being certified and reconsider both adoptions to the extent they are not barred by the statute, including by considering whether a non-adoptive placement such as guardianship may be in the children's best interests and by receiving additional evidence if the trial court so chooses.[6]

Dickson, Rucker, David, and Massa, JJ., concur.

---

[6] We also note that the findings and conclusions were signed by the magistrate, but not by the court. Magistrates may enter final orders in criminal cases, I.C. §§ 33-23-5-5(14), -9(b), but otherwise "may not enter a final appealable order unless sitting as a judge pro tempore or a special judge." I.C. § 33-23-5-8(2). Instead, they may only "report findings," while "[t]he court shall enter the final order." I.C. § 33-23-5-9(a). Effective July 1, 2015, Indiana Code section 33-23-5-5 has been amended to expand magistrates' authority to approve and accept plea agreements, civil settlement agreements, and agreements in domestic-relations and paternity actions, see P.L. 173-2015, § 4—but that newfound authority does not extend to issuing an adoption decree. We trust the court will observe this necessity on remand.

Nevertheless, "it has been the long-standing policy of this court to view the authority of the officer appointed to try a case not as affecting the jurisdiction of the court"—and so "the failure of a party to object at trial to the authority of a court officer to enter a final appealable order waives the issue for appeal." Floyd v. State, 650 N.E.2d 28, 32 (Ind. 1994). The issue is thus waived here, since neither party has raised it.