# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 25 2019, 7:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Bryan H. Babb
Sarah T. Parks
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of The Civil Commitment of: <br><br> T.K., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Eskenazi Health/Midtown CMHC, <br><br> *Appellee-Petitioner* | January 25, 2019 <br><br> Court of Appeals Case No. 18A-MH-757 <br><br> Appeal from the Marion Superior Court, Probate Division <br><br> The Honorable Steven R. Eichholtz, Judge <br><br> The Honorable Kelly M. Scanlan, Commissioner <br><br> Trial Court Cause No. 49D08-1803-MH-8810 |

**Altice, Judge.**

## Case Summary

[1] T.K. appeals the trial court's order for involuntary regular commitment, which was based on the trial court's determination that T.K. was mentally ill and gravely disabled. T.K. presents a number of issues of which we address only two: 1) whether the commitment order is defective because it contained only the signature of a commissioner and 2) whether sufficient evidence supported his involuntary civil commitment.

[2] We reverse.

## Facts & Procedural History

[3] At the age of fifty-one, T.K. has a long history of schizophrenia, which he does not dispute on appeal. He has prior hospitalizations, including involuntary commitments, due to his mental health. T.K. had an involuntary temporary commitment in 1999, an involuntary regular commitment in 2002, and an involuntary temporary commitment in 2011. An involuntary regular commitment in 2013 was reversed by our Supreme Court for insufficient evidence that T.K. was either dangerous or gravely disabled. *Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271 (Ind. 2015).

[4] On Friday, March 2, 2018, T.K. was taken to Eskenazi Hospital (the Hospital) on an immediate detention. The following Monday, the Hospital completed an application for emergency detention of mentally ill person, alleging that T.K. was extremely paranoid and exhibiting threatening behaviors. The Hospital

filed a report following emergency detention with the trial court on March 7, 2018, along with a physician statement by psychiatrist Aimee Patel. Dr. Patel opined that due to his psychiatric disorders, T.K. was both dangerous to others and gravely disabled. The Hospital sought an involuntary regular commitment of T.K.

[5] Commissioner Kelly M. Scanlan presided over the commitment hearing held on March 9, 2018, and permitted T.K. to represent himself. The Hospital presented the testimony of two witnesses, Dr. Patel and Shelley Ulsenheimer, an FBI agent. The trial court also took judicial notice of the prior commitments. In closing, T.K. noted that he was employed, maintained a clean house and two vehicles, and cared for his daily needs.

[6] Dr. Patel's testimony was limited because, although she had been T.K.'s treating physician for nearly a week, her interactions with him were "very brief." *Transcript* at 17. Dr. Patel explained that after a few moments, T.K. generally began yelling and speaking over her and other doctors. Dr. Patel testified that on one occasion she spoke with T.K. as he walked the unit. He "became upset midway through and began cursing, referenced a baseball bat and told [her] to leave him alone." *Id.* at 18.

[7] Dr. Patel diagnosed T.K. with schizophrenia, as well as possibly paranoid personality disorder and narcissistic personality disorder.[1] As a result of his mental illness, Dr. Patel opined that T.K. was gravely disabled due to "substantial impairment in judgment and decision making" resulting in "difficulty residing independently in the community." *Id.* at 24, 20. In this regard, Dr. Patel noted generally that T.K.'s "delusions and paranoia have led to him having repeated hospitalizations and contacts with the law enforcement system." *Id.* at 24. Dr. Patel did not elaborate on her assertion regarding T.K.'s contacts with law enforcement. Presumably, she was referring to his many calls to the FBI and local law enforcement. With respect to the claim of repeated hospitalizations, the record reveals no voluntary or involuntary commitments – other than the one at hand – after his regular commitment in 2013, which was reversed by the Supreme Court. Though opining that T.K. had difficulty residing independently, Dr. Patel acknowledged that T.K. had his own residence, had income, and took care of his daily needs (eating, personal hygiene, and sleeping).

[8] Regarding an alternative basis for commitment, Dr. Patel testified that she believed T.K. was dangerous to others because he had made threats toward her and others on the treatment team. Dr. Patel noted that T.K. was agitated on

---

[1] T.K. has delusions, paranoia, and grandiose beliefs. In particular, he believes that law enforcement, medical personnel, and the government are out to get him. He believes that millions of dollars in patents have been stolen from him by the government and that he is being watched, stalked, and harassed by local law enforcement and EMS.

the first day of his emergency detention, requiring medication and restraints, and that since that time he had made various verbal threats. Medical students were kept away from T.K. out of concern for their safety. T.K. refused to take his oral medication and lacked insight into his mental illness.

[9] The Hospital then called Agent Ulsenheimer as a witness for the purpose of introducing recordings of nineteen voicemails left for a public affairs specialist with a local FBI office. These voicemail recordings, which were admitted over T.K.'s objection, each began with the caller identifying himself as T.K. The messages were left between February 25 and March 1, 2018, some in the middle of the night. They reveal T.K.'s delusional and paranoid thinking. In the messages, T.K. indicates that he has been stalked by local law enforcement for the last twenty-five years and that his inventions have been stolen. He expresses frustration that the FBI is not helping him with the situation and indicates that he is going to make all of this public, noting that he has accumulated substantial evidence. Notably, the messages contain no threats of violence by T.K.

[10] At the conclusion of the hearing, Commissioner Scanlan found by clear and convincing evidence that T.K. suffered from mental illness and was gravely disabled. Regarding grave disability, Commissioner Scanlan stated, "he is demonstrating a substantial impairment and an obvious deterioration in his judgment reasoning and behavior that has resulted in his inability to function independently." *Id*. at 59. Accordingly, Commissioner Scanlan entered an

order of regular commitment based on T.K. being mentally ill and gravely disabled.[2] T.K. now appeals.

## Discussion & Decision

## Defective Order

[11] We initially address T.K.'s claim that the order for temporary commitment is defective because it contains only the signature of Commissioner Scanlan and lacked the required judge's signature. Indeed, Indiana law expressly barred Commissioner Scanlan from entering a final appealable order in this case. *See* Ind. Code § 33-23-5-8;[3] *Capehart v. Capehart*, 771 N.E.2d 657, 662 (Ind. Ct. App. 2002) ("magistrates and commissioners have identical authority").

[12] Regardless, T.K. has waived appellate review of this issue because he did not object to the commitment order at any point prior to this appeal.[4] "'[I]t has been the long-standing policy of [the Indiana Supreme Court] to view the authority of the officer appointed to try the case not as affecting the jurisdiction of the court' – and so 'the failure of a party to object at trial to the authority of a

---

[2] Although asserted by the Hospital as a ground for commitment, Commissioner Scanlan did not find that T.K. was a danger to himself or others. Commissioner Scanlan acknowledged evidence of threats but observed that there is no evidence that "T.K. had actually tried to harm others." *Id.*

[3] This statute has since been amended, effective July 1, 2018. The amendment removed the limitation regarding magistrates (and, thus, commissioners) entering a final appealable order. I.C. § 33-23-5-9(a), however, still requires that the court "enter the final order" in instances such as this.

[4] The order was signed by Commissioner Scanlan on March 9, 2018, and T.K. filed his notice of appeal on April 9, 2018. T.K. had ample time between these dates where he could have filed an objection to the fact that the commitment order lacked a judge's signature.

court officer to enter a final appealable order waives the issue for appeal.'" *In re Adoption of I.B.*, 32 N.E.3d 1164, 1173 n.6 (Ind. 2015) (quoting *Floyd v. State*, 650 N.E.2d 28, 32 (Ind. 1994)); *see also City of Indianapolis v. Hicks*, 932 N.E.2d 227, 231 (Ind. Ct. App. 2010) ("defects in the authority of a court officer, as opposed to jurisdiction of the trial court itself, to enter a final order will be waived if not raised through a timely objection"), *trans. denied*. "[A]ny objection to the authority of an adjudicative officer must be raised at the first instance the irregularity occurs, or at least within such time as the tribunal is able to remedy the defect." *Hicks*, 932 N.E.2d at 231.

## Sufficiency of the Evidence

[13] In an involuntary regular commitment case, the petitioner is required to prove by clear and convincing evidence: "(1) the individual is mentally ill and *either* dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e) (emphasis supplied); *see also T.K.*, 27 N.E.3d at 273. The trial court's order of commitment in this case declared that T.K. was mentally ill and gravely disabled. On appeal, T.K. does not challenge the finding regarding his mental illness, but he contends that the "gravely disabled" element was not proven by clear and convincing evidence.

[14] Our Supreme Court has observed that civil commitment proceedings serve both to protect the public and to ensure the rights of the person whose liberty is at stake. *Id*. To satisfy the requirements of due process in commitment proceedings, the facts justifying the commitment must be shown by clear and

convincing evidence. *Id.* This heightened standard "not only communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment" but "also has the function of reducing the chance of inappropriate commitments." *Id.* (quoting *Commitment of J.B.* v. *Midtown Mental Health Ctr.*, 581 N.E.2d 448, 450 (Ind. Ct. App. 1991), *trans. denied*).

[15] In reviewing the sufficiency of the evidence supporting an involuntary civil commitment, we consider the probative evidence and reasonable inferences supporting the order, without reweighing the evidence or assessing witness credibility. *Id.* We will affirm if a reasonable trier of fact could find the necessary elements proven by clear and convincing evidence. *Id.* "Clear and convincing evidence requires the existence of a fact to be highly probable." *Civil Commitment of J.B. v. Cmty. Hosp. N.*, 88 N.E.3d 792, 795 (Ind. Ct. App 2017). "There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom." *J.B.*, 581 N.E.2d at 451.

[16] The issue presented in this case is whether, considering the probative evidence and reasonable inferences favorable to the judgment, a reasonable trier of fact could have found by clear and convincing evidence that T.K. was gravely disabled.[5] "Gravely disabled" is defined as:

---

[5] Dangerousness is not at issue because the trial court did not make such a finding to support the commitment order.

a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96. This case involves subsection 2, as there is no dispute that T.K. was able to provide for his daily needs, along with being employed and maintaining a home.

As set forth above, T.K.'s 2013 involuntary regular commitment was overturned by our Supreme Court based on insufficient evidence. The Department of Veterans Affairs, the petitioner in that case, presented the testimony of Dr. Joseph Bishara. Dr. Bishara testified as to T.K.'s mental illness and indicated that T.K. was paranoid over a wide range of institutions persecuting and targeting him. *T.K.*, 27 N.E.3d at 274. T.K. had been brought in on an emergency detention because he had been putting flyers on people's windshields regarding another individual's criminal record and had gone into a clinic and screamed at staff. Dr. Bishara testified that he had observed aggressive, disruptive behavior toward another physician and that other patients were fearful of T.K. Additionally, T.K.'s son had contacted Dr. Bishara and expressed concern over his father's erratic and aggressive behavior.

[18]     In reversing T.K.'s 2013 commitment, the Court discussed the element of "grave disability" as follows:

> Dr. Bishara's opinion that T.K. was gravely disabled was based on T.K.'s refusal of treatment, T.K.'s denial that he had any mental illness problem, and reports that T.K. had been aggressive in several areas of his life. The Legislature, however, has defined "gravely disabled" as a condition that causes an individual to (1) be unable to meet their basic food, clothing, and shelter needs or (2) be so obviously impaired in judgment, reasoning, or behavior that such individual is unable to function independently. Both Dr. Bishara and T.K. testified that T.K. rents his own home, lives by himself, holds full-time employment, and owns two vehicles while making payments on a third. No evidence was presented to dispute his ability to provide food, clothing, or shelter for himself. As to whether T.K. was or is gravely disabled, the Department points to his refusal to admit he has a mental illness or to take medication, but such denial of illness and refusal to medicate, standing alone, are insufficient to establish grave disability because they do not establish, by clear and convincing evidence, that such behavior "results in the individual's inability to function independently."

> In this case, at the time of the commitment hearing in October, T.K. had not been on medication since April, and in that six months T.K. had secured full-time employment and started renting a home. We do not weigh into the efficacy of whether medication is appropriate for T.K., but the evidence in this case has not clearly and convincingly shown that T.K.'s refusal to take medication and recognize his illness constitutes grave disability by resulting in such a "substantial impairment or an obvious deterioration of [T.K.'s] judgment, reasoning, or behavior that ... [he is unable] to function independently." Ind. Code § 12-7-2-96(2). The most favorable testimony to the trial court's decision is that T.K. was aggressive, loud, talked in a coarse manner that was inappropriate, and proactively sought to shame someone by

placing flyers on people's windshields. While we certainly do not condone such behavior and would like to see cooperation between T.K. and medical professionals, the evidence put forth by the Department does not clearly and convincingly support the proposition that T.K. is gravely disabled. T.K. made no physical outbursts, destroyed no property, did not put himself or others in actual danger with idiosyncratic behavior, and was not at risk of suffering a lack of food, clothing, or shelter. Instead, at best, the evidence suggests that T.K.'s loud, boisterous, and rude public behavior harmed his reputation and made others not want to be around him. That is not sufficient evidence to support a civil commitment on grounds of grave disability.

*Id.* at 276-77 (citations omitted); *see also Commitment of M.E. v. Dep't of Veterans Affairs*, 64 N.E.3d 855, 863 (Ind. Ct. App. 2016) ("M.E.'s aggression, paranoia, and confrontational attitude do not establish an inability to function independently under the law."), *disapproved on other grounds by A.A. v. Eskenazi Health/Midtown CMHC*, 97 N.E.3d 606, 611 (Ind. 2018).

[19] In this case, Dr. Patel's opinion that T.K. was gravely disabled was based on her general observation that T.K.'s "delusions and paranoia have led to him having repeated hospitalizations and contacts with the law enforcement system." *Transcript* at 24. Dr. Patel did not further elaborate on this statement, and there was no evidence presented of hospitalizations since the 2013 commitment that was reversed on appeal or details regarding T.K.'s contacts with law enforcement.

[20] Like the previous case, there was evidence presented that T.K. had been loud and verbally aggressive during the emergency commitment. Further, in the five

days leading up to his most-recent commitment, T.K. left nineteen voicemail messages for an FBI official, expressing his delusional and paranoid thoughts and his dissatisfaction with the FBI's failure to assist him. These voicemail messages clearly evidence T.K.'s mental illness and paranoid delusions regarding the government. But I.C. § 12-7-2-96(2) requires more than paranoid judgment, reasoning, or behavior to establish grave disability. The Hospital was required to establish by clear and convincing evidence T.K.'s inability to function independently as a result. The Hospital wholly failed in this regard. The messages left by T.K. were no doubt annoying to the FBI public affairs specialist receiving them, but at no point did T.K. threaten violence. Rather, he threatened to publicize the government's behavior and the FBI's lack of action. While misguided, the messages do not evidence an inability to function independently, nor do T.K.'s general discontent and rudeness during this recent involuntary commitment.

[21] We are compelled to conclude that the evidence presented by the Hospital does not establish by clear and convincing evidence that T.K.'s mental impairment or deterioration of judgment, reasoning, or behavior had resulted in his inability to function independently. T.K.'s delusions and paranoia are obvious and long-standing, and his mental illness has led to inappropriate behavior and repeated calls to the FBI. T.K.'s behavior continues to be abrasive, boisterous, irritating, and idiosyncratic, but there is no support in the evidence for a commitment

based on grave disability.  Thus, we conclude that T.K.'s civil commitment was improper.[6]

[22]    Judgment reversed.


Brown, J., concurs.

Tavitas, J., dissents with opinion.

---

[6] Because we reverse on insufficient evidence grounds, we do not reach T.K.'s three remaining evidentiary and due process claims.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of The Civil Commitment of: | Court of Appeals Case No. 18A-MH-757 |
| T.K., | |
| *Appellant-Respondent,* | |
| v. | |
| Eskenazi Health/Midtown CMHC, | |
| *Appellee-Petitioner* | |

**Tavitas, Judge, dissenting**.

I respectfully dissent. I would concur with the majority's result if the trial court's order was a final appealable order, but I part with the majority on the same grounds stated in my dissenting opinion in *In Re Civil Commitment of T.W.*, No. 18A-MH-1148, slip op. at pp. 13-20 (Ind. Ct. App. Nov. 21, 2018). In my opinion, the commitment order is defective. By issuing a blanket order, which summarily approved all recommendations of the court commissioner without specifically reviewing the case(s) and approving the commissioner's recommendations, the trial court delegated its duty to render final decisions to the commissioner without statutory authority.

[24] I disagree with the majority's conclusion that this issue is waived. Finding waiver penalizes the respondent for failing to "timely" urge the trial court judge to perform his statutory duty. A litigant cannot waive a trial court judge's exercise of statutory responsibility. Such abdication by trial court judges should not be litigants' and appellate courts' problem to resolve.

[25] Accordingly, I would remand to the trial court judge for review and approval of the commissioner's recommended order for temporary commitment.