

FILED

Sep 27 2017, 11:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re D.F., Kn.L., Ka.L. and M.M., Children Alleged to Be in Need of Services, | September 27, 2017 |
| | Court of Appeals Case No. 82A04-1704-JC-869 |
| L.T. (Mother) | |
| *Appellant-Respondent,* | Appeal from the Vanderburgh Superior Court 4 |
| v. | The Honorable Brett J. Niemeier, Judge |
| Indiana Department of Child Services, | The Honorable Renee A. Ferguson, Magistrate |
| *Appellee-Petitioner.* | Trial Court Cause Nos. 82D04-1610-JC-1841 82D04-1610-JC-1842 82D04-1610-JC-1843 82D04-1610-JC-1844 |

**Mathias, Judge.**

[1] L.T. ("Mother") appeals the order of the Vanderburgh Superior Court determining that her minor children D.F., Kn.L., Ka.L. and M.M., are in need

of services. Mother claims that the Indiana Department of Child Services ("DCS") failed to present evidence sufficient to support the trial court's determination.

We affirm.

## Facts and Procedural History

Mother is the biological mother of D.F., born in April 2000; Kn.L., born in September 2002; Ka.L., born in September 2006; and M.M., born in August 2012. At the time relevant to this appeal, Mother was in a relationship with the biological father of M.M., C.M., who occasionally spent the night at Mother's home. Mother has been diagnosed with bipolar disorder, schizophrenia, and post-traumatic stress disorder. Mother also appeared to have an alcohol problem; she drank alcohol on a daily basis and was frequently intoxicated.

On the night of October 7, 2016, Mother was drinking alcohol and became intoxicated. At approximately three o'clock in the morning of October 8, Mother, still intoxicated, burst into the children's bedroom and told them to wake up. All of the children, plus a family friend, were in the bedroom at the time. Mother threatened to strike D.F. with a hair dryer if she did not comply. Mother accused the two older girls, D.F. and Kn.L., of sending nude pictures of themselves to others via their cell phones. D.F. denied this, which enraged Mother, who claimed to have proof of her accusations on her own cell phone. Mother then struck D.F. in the face with her fist several times. She also hit D.F. in the face with her cell phone at least twice.

When Mother hit D.F. with the cell phone, the child ran away from Mother and screamed for Mother to stop hitting her. Mother continued until her boyfriend C.M. intervened. Mother became angry with C.M. and kicked him out of the house. Mother then continued her tirade against D.F. She punched D.F. in the chest, knocking her to her knees. This caused D.F. to have trouble breathing.

D.F. screamed at Mother to stop and stated, "Why don't you just let us leave? . . . You don't care about us anyways." Tr. p. 36. D.F. also mentioned her father, who had passed away. Mother responded, "F your daddy. Your daddy didn't care about you anyway. . . . That's why you don't even know your daddy and your daddy didn't want you." *Id*. This caused D.F. to cry, but Mother told her to shut up and lie down.

At some point after she stopped attacking D.F., Mother turned her attention to Kn.L., the second-oldest child in the house. Mother took Kn.L. to the laundry room and began to hit and punch her. Kn.L. was able to shield her face with her arms, so Mother could not strike her in the face. Mother also pulled and dragged Kn.L. by her hair, which ripped out some of the braids in her hair.

D.F. and Kn.L. eventually decided to leave the house, but Mother blocked the door, daring them to "[c]ross this line." *Id*. Mother also threatened to hit D.F. again if she attempted to leave. Not wanting to be hit again, D.F. decided not to challenge her mother at that time. Still, she begged Mother to let them leave. Mother told them they could leave if they took their clothes off, which Mother

claimed, inaccurately, to have bought. At some point thereafter, Mother calmed down enough to apologize to the girls for her behavior. Mother asked D.F. if she forgave her, but D.F. said, "No, I don't forgive you." *Id.* at 43. Mother then told D.F. to leave.

[9] At approximately four o'clock in the morning, D.F. and Kn.L. left their Mother's home, wearing only sleep clothes; D.F. did not even have shoes on. It was very cold on that autumn night, so the children when to a friend's house where D.F. borrowed some shoes. They then walked twenty minutes to the home of their aunt, D.B. ("Aunt"). D.F. told Aunt that Mother had "hit us again." *Id.* at 44. Seeing that D.F.'s jaw was swollen, Aunt took the children to the hospital and telephoned the police to report Mother's behavior. Aunt later stated that Mother drank alcohol and smoked marijuana.

[10] DCS was contacted, and Brittany Harper ("Harper"), a DCS assessment manager, spoke with D.F. and Kn.L at the hospital that morning. Both girls were still wearing only pajama pants and small tank tops. Harper noted that Kn.L. had a scratch on her left cheek and that a "chunk of hair" had been ripped from her head. *Id.* at 18. She also noticed swelling on D.F.'s jawline.

[11] Harper went to Mother's home with the police to attempt to contact Mother, but no one answered the door. Harper was eventually able to contact Mother on October 11, 2016, at the courthouse prior to a scheduled hearing. Harper informed Mother that she had been trying to get a hold of her to discuss the issues with the children. Mother admitted her history of mental illness. When

Harper requested that Mother submit a hair and urine sample to screen for drugs, Mother refused. Instead, "she ripped out a chunk of her hair and threw it at [Harper] and said, 'That is my drug screen.'" *Id.* at 20. Following this, and with the assistance of the police, DCS removed the two younger children, Ka.L., and M.M., from Mother's care. The children were placed in relative care.

[12] D.F. explained that Mother had a pattern of physically abusing the oldest children. When D.F. was young, Mother would abuse D.F.'s two older siblings, who are now adults. Once these siblings moved out, Mother directed her anger at D.F. and Kn.L.

[13] Tiffany Austin ("Austin"), a school social worker, became involved with Kn.L. and Ka.L. after the children came to school with body odor so overpowering that teachers had to open up the windows. Austin allowed the girls to shower at school and even washed their clothes at the school. On one occasion, Ka.L.'s clothes smelled so bad that Austin had to wash them three times before they could be worn. Ka.L. began to shower regularly at the school, and Austin would provide her with toiletries, including deodorant. Austin approached Mother to talk to her about the girls' hygiene issues, but Mother was not receptive to Austin's suggestions.

[14] On October 12, 2016, DCS filed a petition alleging that D.F., Kn.L., Ka.L., and M.M. were children in need of services ("CHINS"). This was not Mother's first interaction with DCS. In 2000, DCS substantiated a report that Mother's

newborn child was born exposed to marijuana. Similar substantiated reports were made in 2006 and 2012, both times with the infants having been exposed to marijuana.

[15] On March 8, 2017, a CHINS fact-finding hearing was held, presided over by the trial court magistrate. Mother testified and denied the accusations against her, claiming that all the other witnesses were lying. Also on March 8, the trial court's chronological case summaries ("CCS") contain an entry dated the same day as the fact-finding hearing which indicates that the trial court judge adjudicated the children to be CHINS.[1]

[16] A dispositional hearing was held on April 4, 2017, again presided over by the trial court magistrate. The CCS entries for that date provide in relevant part:

> Disposition held and ordered. Zero reimbursement/support ordered to DCS. Parental participation ordered on the mother and [C.M.]. DCS will provide bus tokens to the mother and [C.M.] for visits. DCS tendered to the mother the letter and code regarding her random drug screens. Mother reviewed the letter with her attorney understands what she needs to do. Mother advises the Court she intends to file on Appeal. Court appoints Erin Berger to represent Mother for the purposes of Appeal. Permanency is set for 10/3/17 at 8:00 A.M. Mother and [C.M.] are ordered to appear. The Court issues its standard dispositional

---

[1] These entries state in their entirety:

> Disposition (Judicial Officer: Niemeier, Brett J)
> 01.      31-34-1-1/: Child in Need of Services (CHINS)
>          Adjudicated CHINS

Appellant's App. pp. 9, 15, 20, 25.

order including 4-E language & findings effective today's date. Detailed written order to be provided by DCS.

Appellant's App. pp. 9, 15, 21, 25–26.

On April 20, 2017, Mother filed her Notice of Appeal. In her Notice of Appeal, Mother described the order being appealed as "Finding that the children are CHINS and Dispositional Order." Appellant's App. p. 2. But the trial court had not yet issued its written orders adjudicating the children to be CHINS or its dispositional order. It was not until May 5, 2017, that the trial court issued written orders adjudicating the children to be CHINS and issued dispositional orders ordering Mother to participate in various services. These orders, however, were signed only by the trial court magistrate, not the trial court judge.

## I. A Trial Court Magistrate Does Not Have the Authority to Enter a Final Order in a Civil Case

The procedural posture of this case requires us to review the law regarding the appeal of CHINS orders and the powers of a judicial magistrate. Our supreme court explained earlier this year that:

> [w]ithin the CHINS context, a court's "finding of CHINS status is a mere preliminary step" to final disposition of the matter. Standing alone, the CHINS finding "d[oes] not constitute a final, appealable judgment." Even after making a CHINS determination, the court is still required to hold a dispositional hearing to determine next steps in the child's placement, care, treatment, or rehabilitation and the nature and extent of the parent's, custodian's, or guardian's role in fulfilling those steps.

Ind. Code § 31-34-19-1. The court must then issue written findings and conclusions in a dispositional decree. *Id*. § 31-34-19-10. *To the extent our case law leaves any doubt, we make explicit that a CHINS determination, by itself, is not a final judgment.*

*In re D.J. v. Indiana Dep't of Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017) (emphasis added) (quoting *In re J.L.V.*, 667 N.E.2d 186, 188 (Ind. Ct. App. 1996)).

[19] Here, the trial court's CHINS adjudication, which is not a final appealable order, was entered into the CCS on the same day that the CHINS fact-finding hearing was held. And the CCS indicates that this entry was made by the trial court judge. The written CHINS adjudications, however, were not entered until May 5, 2017, and were signed only by the trial court magistrate.

[20] And on the same day as the CHINS dispositional hearing, the trial court's CCS entries indicate that the trial court magistrate entered its "standard dispositional order[s]," with the required written orders to follow. This is presumably a reference to the statutorily required[2] written findings and conclusions that must accompany a trial court's dispositional decrees, which were entered on May 5, 2017. But again, these written findings and conclusions were signed only by the trial court magistrate, not the trial court judge. And, before these written

---

[2] *See* Ind. Code 31-34-19-10(a) ("The juvenile court *shall* accompany the court's dispositional decree with written findings and conclusions upon the record[.]") (emphasis added).

findings and conclusions were entered, Mother had already filed her Notice of Appeal.

[21] Despite this, there is no jurisdictional impediment to the fact that Mother filed her Notice of Appeal before the trial court entered its statutorily-required findings and conclusions. *See In re D.J.*, 68 N.E.3d at 578–79 (holding that parents' premature notice of appeal, which was filed after the dispositional hearing but before the entry of the dispositional order, forfeited the parents' right to appeal, but that the court maintained appellate jurisdiction to hear the merits of the parents' appeal). As explained in *In re D.J.*, "[t]he only two prerequisites under our appellate rules are (i) the trial court must have entered an appealable order, and (ii) the trial clerk must have entered the notice of completion of clerk's record on the CCS." *Id.* at 578.

[22] We now turn our attention to the fact that there is no indication in the record on appeal that the trial court judge, as opposed to the trial court magistrate, signed the required dispositional orders.

> Magistrates may enter final orders in criminal cases, I.C. §§ 33-23-5-5(14), -9(b), but otherwise "may not enter a final appealable order unless sitting as a judge pro tempore or a special judge." I.C. § 33-23-5-8(2). Instead, they may only "report findings," while "[t]he court shall enter the final order." I.C. § 33-23-5-9(a).

*In re Adoption of I.B.*, 32 N.E.3d 1164, 1173 n.6 (Ind. 2015).

[23] Here, the dispositional orders being appealed were not signed by the trial court judge. Although our supreme court held in *In re D.J.* that the one of two

jurisdictional prerequisites was that the trial court must have entered an appealable order," 68 N.E.3d at 578, the court has also noted that "it has been the long-standing policy of [our supreme] court to view the authority of the officer appointed to try a case not as affecting the jurisdiction of the court." *In re I.B.* 32 N.E.3d at 1173 n.6. Thus, "the failure of a party to object at trial to the authority of a court officer to enter a final appealable order waives the issue for appeal." *Id*. (citing *Floyd v. State*, 650 N.E.2d 28, 32 (Ind. 1994)). Here, there is no indication that either party has objected to the fact that the trial court judge did not sign the appealable dispositional orders. The issue is therefore waived. *See id*.

[24] Waiver notwithstanding, we take this opportunity to note what appears to be a pattern in this particular trial court. In *In re I.B.*, also an appeal from the Vanderburgh Superior Court 4, the trial court's findings and conclusions were signed only by the magistrate, not the trial court judge. 32 N.E.3d at 1173 n.6. After noting the limits on the power of a magistrate, our supreme court wrote, "We trust the court will observe this necessity on remand." *Id*.

[25] Shortly thereafter, in another appeal from the Vanderburgh Superior Court 4, our supreme court wrote:

> We repeat our advisement that was recently provided in [*In re Adoption of I.B.*]. We note again that the findings and conclusions in the present case were signed by the magistrate, but not by the court. Magistrates "may not enter a final appealable order unless sitting as a judge pro tempore or a special judge." Ind. Code § 33-23-5-8(2). *We trust that this requirement will be observed in the future.*

*K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 652 n.8 (Ind. 2015) (emphasis added). These admonitions have apparently gone unheeded.[3]

[26] We are well aware that trial court judges are oftentimes subject to an incredible workload, and those trial court judges who are privileged to have magistrates to assist them in this workload rely upon the magistrates to help them manage their valuable time. But we cannot continue to overlook the repeated failure to abide by the requirements of the statutes empowering magistrates. We therefore say in no uncertain terms: trial court magistrates do not have the authority to enter final judgments in civil cases, including juvenile cases. *See In re I.B.*, 32 N.E.3d at 1173 n.6. Final dispositional orders in CHINS cases must be signed by the trial court judge, not simply the magistrate. *See id.* The failure of the trial court to do so only increases the chance of unnecessary delays in otherwise time-sensitive cases involving children.

[27] Because neither party here has raised any objection to the authority of the magistrate in this case, and in light of our preference to decide cases on their merits whenever possible, we will address Mother's appeal on its merits.

## II. The CHINS Statutes and Our Standard of Review

[28] As explained by our supreme court in *In re N.L.*, 919 N.E.2d 102, 105 (Ind. 2010), Indiana Code sections 31-34-1-1 through 31-34-1-11 specify the elements

---

[3] Two prior appeals of decisions of this specific trial court involved orders that also suffered from the same deficiency. However, our decisions in those cases have been memoranda decisions, so we do not cite them here.

that DCS must prove in order to establish that a child is in need of services: (1) the child is under the age of 18; (2) one or more particular set or sets of circumstances set forth in the statute exists; and (3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court.

[29] In this case, DCS alleged that the children were in need of services under Indiana Code sections 31-34-1-1, 31-34-1-2, and 31-34-12-4. The first of these sections provides that a child is a CHINS if, before the child becomes eighteen years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1. This statute has been referred to as the "neglect statute." *See In re Ju.L.*, 952 N.E.2d 771, 777 n.4 (Ind. Ct. App. 2011).

[30] The second section provides that a child is a CHINS if, before the child becomes eighteen years of age:

(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-2. This statute has been referred to as the "abuse statute." *See In re Ju.L.*, 952 N.E.2d at 777 n.4.

[31] And the last of the above-mentioned sections provides:

A rebuttable presumption is raised that the child is a child in need of services because of an act or omission of the child's parent, guardian, or custodian if the state introduces competent evidence of probative value that:

(1) the child has been injured;

(2) at the time the child was injured, the parent, guardian, or custodian:

(A) had the care, custody, or control of the child; or

(B) had legal responsibility for the care, custody, or control of the child;

(3) the injury would not ordinarily be sustained except for the act or omission of a parent, guardian, or custodian; and

(4) there is a reasonable probability that the injury was not accidental.

I.C. § 31-34-12-4. We will refer to this statute as the "presumption statute."

[32] "[T]he purpose of a CHINS adjudication is to protect children, not punish parents." *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015), *trans. denied* (citing *N.L.*, 919 N.E.2d at 106). A CHINS adjudication is not a determination of parental fault but rather is simply a determination that a child is in need of services and is unlikely to receive those services without the court's intervention. *Id*. (citing *N.L.*, 919 N.E.2d at 105). Because CHINS proceedings are civil in nature, DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the relevant statutes. *Id.*

[33] On appeal, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id*. Instead, we consider only the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. at 40. We reverse only upon a showing that the decision of the juvenile court was clearly erroneous. *Id*.

### III. DCS Presented Sufficient Evidence to Support the Trial Court's CHINS Determinations

[34] Mother claims that DCS presented insufficient evidence to support the trial court's CHINS findings. We disagree.

[35] With regard to D.F., the trial court found that DCS had met its burden under the presumption statute. That is, DCS presented evidence that D.F. had been injured; she had been struck repeatedly in the face and head by Mother, who used both her hands and a cell phone to strike the girl. This caused swelling to D.F.'s face. DCS also presented evidence that, at the time D.F. was injured,

Mother had care, custody, and control of D.F. and that the injury would not have been sustained except for Mother's act of striking the child. And there was more than a reasonable probability that the injury was not accidental; it was the result of Mother's intentional acts of striking D.F. in the head.

[36] Thus, there was a rebuttable presumption that D.F. was in need of services because of an act or omission of Mother. *See* I.C. § 31-34-12-4. And the trial court could reasonably conclude that Mother failed to rebut this presumption. Indeed, the trial court gave no credit to Mother's testimony and her claims that all the other witnesses were lying. In short, there was sufficient evidence to support the trial court's determination that D.F. was a CHINS.

[37] The same is true with regard to Kn.L. The trial court credited the testimony that Mother attacked Kn.L. The child had to shield her face with her arms to protect herself from Mother's blows. Mother pulled and dragged Kn.L. by her hair, ripping out some of her braids. This was corroborated by the DCS assessment manager who testified that Kn.L. had a scratch on her face and was missing a "chunk of hair." Tr. p. 18. Again, DCS presented evidence that Kn.L. was injured while in Mother's care, that the injury would not have been sustained but for Mother's acts of physical abuse, and that the injury was not accidental. This raised a rebuttable presumption that Kn.L. was in need of services because of an act or omission of Mother. *See* I.C. § 31-34-12-4. And the trial court wholly discredited Mother's self-serving testimony. Thus, she did not successfully rebut the presumption that Kn.L. was a CHINS.

[38] With regard to the two younger children, Ka.L. and M.M., we also conclude that DCS presented evidence sufficient to support the trial court's CHINS finding. Both Ka.L. and M.M. were in the house when Mother viciously attacked their two older sisters. Mother was frequently drunk and also smoked marijuana. Mother admitted to DCS that she had been diagnosed with several mental illnesses. School officials noted a marked lack of hygiene with regard to Ka.L., and the child had to shower and wash her clothes at school. Mother was resistant to any offer of help from DCS. From this evidence, the trial court could reasonably conclude that both Ka.L. and M.M.'s mental or physical health was seriously impaired by Mother's inability or refusal to provide the children with the necessary supervision.

[39] The trial court could also reasonably conclude that the care, treatment, or rehabilitation needed to address these circumstances is unlikely to be provided or accepted without the coercive intervention of the court. Mother admitted to DCS that she had been diagnosed with bipolar disorder, schizophrenia, and post-traumatic stress disorder. Yet instead of receiving any treatment, she self-medicates with alcohol and marijuana. And instead of acknowledging the problems with her parenting of the children, Mother blames the children, her sister, and DCS, and insisted that all the other witnesses were lying. Clearly, the children are in need of care and treatment that they are not receiving, and Mother's behavior supports the trial court's conclusion that the children would not receive such care or treatment without the intervention of the trial court.

# Conclusion

In summary, the trial court magistrate lacked authority to enter a final dispositional order. But since neither party raised the issue of the magistrate's lack of authority, we consider it waived. Furthermore, DCS presented evidence sufficient to support the trial court's conclusion that D.F., Kn.L., Ka.L., and M.M. are in need of services.

Affirmed.

Vaidik, C.J., and Crone, J., concur.