# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2018, 10:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John T. Wilson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: L.G., C.G., A.G., and V.G. (Minor Children Alleged to be in Need of Services) | March 29, 2018 |
| | Court of Appeals Case No. 48A02-1710-JC-2457 |
| M.G. (Father), | Appeal from the Madison Circuit Court |
| *Appellant-Respondent,* | |
| v. | The Honorable G. George Pancol, Judge |
| | Trial Court Cause Nos. |
| Indiana Department of Child Services, | 48C02-1706-JC-274 |
| | 48C02-1706-JC-275 |
| *Appellee-Petitioner* | 48C02-1706-JC-276 |
| | 48C02-1706-JC-277 |

**Vaidik, Chief Judge.**

# Case Summary

[1] M.G. ("Father") appeals the trial court's determination that his four children are in need of services (CHINS). Finding no error, we affirm.

# Facts and Procedural History

[2] Me.G. ("Mother")[1] and Father are married, live in Anderson, and have four children together: L.G., C.G., A.G., and V.G. When this CHINS proceeding began, the children were 10 years old, 9 years old, 4 years old, and 6 months old, respectively.

[3] Mother and Father have a history with the Department of Child Services (DCS). In Fall 2016, L.G., C.G., and A.G. were adjudicated CHINS.[2] The primary concerns were that C.G. was leaving home without the parents' knowledge and that Mother and Father needed mental-health services. C.G. is autistic and non-verbal and has a history of leaving the house naked, running across the street to a neighbor's house, entering the neighbor's house, and taking a picture off the wall and throwing it to the ground.

[4] Initially, Mother engaged in mental-health services and was diagnosed with schizoaffective disorder. Mother, however, stopped participating after only a

---

[1] Mother admitted the CHINS allegations and is not a party to this appeal. Accordingly, we discuss only the facts relevant to Father's appeal.

[2] V.G. was not yet born, so she was not part of that CHINS proceeding.

month or two.  Father did not think that Mother had any mental-health issues and refused to discuss with DCS Mother's issues or the possibility of her re-engaging with services.  The original CHINS case was closed in March 2017 because DCS installed keypad locks on the exterior doors of the home and there were "no safety concerns for the children[.]"  Tr. Vol. I p. 115.

[5]  Three months later, on June 9, Mother let C.G. out of the house because "the voices in her head told her" to let him out.  *Id.* at 18.  C.G., who was naked and "covered in feces," ran to the neighbor's house and threw the same picture on the ground.  *Id.* at 77.  Because C.G. was "covered in feces," the neighbor called the police.  Mother was able to retrieve C.G. from the neighbor before the police arrived.  An Anderson police officer responded to the call and spoke with Mother.  Mother appeared "confused" and not "really with it."  *Id.* at 83.  However, the officer did not call DCS or seek to remove the children from the home.  Father was not home during any of these events.

[6]  The next day, Mother, Father, and V.G. were in the garage together.  Father went inside the house to use the restroom.  When he came back outside, Mother and V.G. were gone.  A little while later, workers at the Anderson Municipal Airport called the police because Mother was walking alongside a runway with V.G.  By the time officers arrived, Mother and V.G. were in the airport parking lot.  Mother was drunk and breastfeeding V.G.  Officers asked her multiple times to stop breastfeeding.  She refused and became belligerent.  Mother eventually agreed to give V.G. to medics who had arrived and to take a field-breathalyzer test.  The test indicated that her blood alcohol concentration

was .212. She admitted to consuming "a quarter fifth of vodka" but had disposed of the bottle before officers arrived. *Id.* at 91. Mother was arrested and charged with neglect of a dependent. V.G. was transported to the hospital for assessment but had no apparent injuries. DCS was called to the hospital to investigate, and Father was called to pick up V.G. from the hospital. DCS spoke with Father and let him take V.G. home. All four children were allowed to remain in Father's care.

[7] On June 21, DCS filed petitions to have all four children adjudicated CHINS. DCS did not seek to have the children removed from the home. One week later, Family Case Manager (FCM) Christy Brubaker received a copy of the June 9 police report and spoke with Father about the incident. Father stated that he was not home at the time because he had taken L.G. and A.G. to the ballpark and that he had no idea that C.G. had gotten out of the house. However, he admitted that he knew on June 9 that Mother was "slipping" mentally but chose to leave C.G. and V.G. in her care. *Id.* at 126. Father added that his plan was to post bail for Mother and have her move back home so that she could "decompress" and he could "assess" her. *Id.* Father is not a mental-healthcare professional, and despite being told that Mother was hearing voices on June 9, Father believed that she was only hearing voices because of the stress of being in jail. Based on Father's comments that he knew Mother was "slipping" and chose to leave V.G. (an infant) and C.G. (a non-verbal, autistic child) in her sole care, DCS amended its CHINS petitions and sought to have all of the children removed from the home. The amended petitions were

granted on June 30. The children were placed in foster care; L.G., A.G., and V.G. were placed together, and C.G. was placed in a separate home because of his autism.

[8]     A fact-finding hearing was held in August 2017, and multiple witnesses testified, including C.G.'s foster mother and Father. C.G.'s foster mother stated that C.G.'s medications were not being properly administered when he arrived. She said that there was at least one missing prescription and that based on the fill date and dosage instructions that his other prescriptions either had too many or too few pills. She had an appointment with a doctor to have C.G.'s medications re-evaluated. Regarding C.G.'s propensity to flee the house, she admitted that C.G. had gotten out of her house on three occasions— twice through the front door and once by climbing out of his bedroom window. However, her yard was fully fenced, including the front yard, and C.G. was not able to get out of the yard.

[9]     Father did not believe that the children were CHINS because he was able to care for them and Mother without the court's intervention. He stated that the family did the best that they could to keep C.G. inside but that "we're human" and "forget" to lock the door sometimes. *Id.* at 169. He pointed out that C.G. had gotten out of his current foster home three times and that before the children were removed, he cared for all four of them for eighteen days without incident.

[10] Regarding caring for Mother, Father posted bail for her in July and immediately checked her into a mental-health facility, where she stayed for six days. She then began an Intensive Outpatient Program (IOP) and saw a therapist and psychiatrist multiple times a month. The record is unclear as to where Mother was living at the time of the hearing. Because of her criminal case, a no-contact order was in place between Mother and V.G. Father was hopeful that the criminal court would vacate the no-contact order at a hearing being held three days after the CHINS fact-finding hearing. If the order was vacated, Mother would move back into the house, and Father's mother would assist with supervising Mother with the children. If the order was not vacated, Mother was to live with her parents in Greenwood.

[11] When asked about Mother's mental-health issues, Father acknowledged that by June 9 he had noticed her "slipping" but that meant she was "being more quiet and more reserved" than normal. *Id.* at 164. He had "no clue" that she was hearing voices. *Id.* Nevertheless, he denied that Mother had schizoaffective disorder and claimed that she was merely depressed. He also denied that Mother abused alcohol and said that alcohol was not kept in their home.

[12] At the conclusion of the hearing, the court adjudicated all four children CHINS. It noted, "We've been down this road before. . . . [T]here is [sufficient evidence] based upon the June 9th and the June 10th incidents and the um fact that we've been here before which leads the Court to believe that coercive intervention of the Court is warranted under the statute." *Id.* at 180-81. The court then held a dispositional hearing and issued a dispositional order

requiring Father to participate in services with DCS, and L.G. and A.G. were returned to the care and custody of Mother and Father. C.G. and V.G. were ordered to remain in the care and custody of their respective foster parents.

[13] Father now appeals.

# Discussion and Decision

[14] Father argues that the evidence is insufficient to support the trial court's determination that the children are CHINS. A CHINS proceeding focuses on the best interests of the children, not the "guilt or innocence" of the parents. *In re D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). "The purposes of a CHINS case are to help families in crisis and to protect children, not punish parents." *Id.* To prove a CHINS allegation, DCS must show, by a preponderance of the evidence, that: (1) the children are under the age of eighteen; (2) one of eleven different statutory circumstances exists that would make the children CHINS under Indiana Code sections 31-34-1-1 to -11; and (3) the care, treatment, or rehabilitation needed to address those circumstances is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Here, the trial court adjudicated the children CHINS under Section 1, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or

neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1. The final element "guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the **ability** to provide for their children, not merely where they encounter **difficulty** in meeting a child's needs." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quotations omitted) (emphases in original).

[15] This Court will neither reweigh the evidence nor judge the credibility of the witnesses. *In re D.F.*, 83 N.E.3d 789, 796 (Ind. Ct. App. 2017). Rather, we consider only the evidence that supports the court's determination and reasonable inference drawn therefrom. *Id.* We will reverse the court's determination only upon a showing that the decision was clearly erroneous. *Id.*

[16] Father argues that the evidence is insufficient to support the adjudication of his children as CHINS and that the coercive intervention of the court is necessary. With regard to L.G. and A.G., Father claims that the court erred because there was no evidence presented that he was not meeting their needs. In its written order, the trial court adjudicated the children CHINS because of "an [i]nability,

refusal, or neglect of a parent, guardian, or custodian to supply child with necessary food, clothing, shelter, medical care, education, or supervision." Appellant's App. Vol. II pp. 42-43.[3] While the events of June 9 and 10 involved only C.G. and V.G., Mother's mental-health issues are not limited to impacting only those two children. During the first CHINS proceeding, Mother stopped attending mental-health services. Not only did Father acquiesce in Mother's decision to stop attending services, but he has also repeatedly downplayed the severity of Mother's mental-health issues. He claimed that Mother heard voices only after being in jail and that she needs to "decompress" at home where he can "assess" her. Furthermore, he claims that hearing voices is not a symptom of schizoaffective disorder but that Mother is merely depressed. When Mother is not receiving mental-health services, all of her children are at risk. There is no way to predict what the voices she hears will tell her to do, and on June 9 they told her to let C.G. out of the house, despite his disabilities. A trial court need not wait until tragedy occurs before entering a CHINS finding. *D.P.*, 72 N.E.3d at 980. In other words, the court need not wait until L.G. and A.G. are involved in an incident with Mother to adjudicate them CHINS.

[17] As for C.G. and V.G., Father claims the trial court erred because he was not home on June 9 and that there was no evidence that he was not meeting their needs. Father, however, knew by June 9 that Mother was "slipping" mentally.

---

[3] Father includes only the CHINS order relating to A.G. in his appendix. We are left to assume that the other three orders had similar, if not identical, findings and conclusions.

Yet, he chose to leave his autistic, non-verbal child and infant child in her sole care. As already discussed, Father has minimized Mother's mental-health issues and did nothing to help her or protect his children. By minimizing Mother's issues, Father was not meeting the needs of his children. The CHINS adjudication for C.G. and V.G. was not clearly erroneous.

[18] Father also contends that there is no evidence that the children's needs would go unmet without the coercive intervention of the court. During the first CHINS case, Mother and Father stopped engaging with DCS's service providers. That case was closed in March 2017. Only after DCS reengaged with Mother and Father did they seek mental-health treatment for Mother, even though Father knew by June 9 that Mother's mental health was "slipping." While the trial court labeled these efforts as "voluntary," we are hard pressed to believe that they would have occurred without the current CHINS proceeding or that they would continue if the CHINS petitions were closed. Accordingly, we affirm the trial court's conclusion that coercive intervention of the court is necessary to ensure the needs of the children are met.

[19] Affirmed.

Barnes, J., and Pyle, J., concur.