

FILED

Jun 18 2018, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
R.O. (MOTHER)

Nicole A. Zelin
Pritzke & Davis, LLP
Greenfield, Indiana

ATTORNEY FOR APPELLANT
C.Q. (FATHER)

Linda Klain
Law Office of Linda B. Klain, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of:  A.Q., K.Q., and R.Q. (Minor Children), | June 18, 2018 |
| R.O. (Mother) and C.Q. (Father), | Court of Appeals Case No. 47A05-1710-JC-2353 |
| *Appellants-Respondents,* | Appeal from the Lawrence Circuit Court |
| v. | The Honorable Andrea K. McCord, Judge |
| Indiana Department of Child Services, | The Honorable John M. Plummer III, Referee |
| *Appellee-Petitioner* | Trial Court Cause Nos. 47C01-1501-JC-030 47C01-1501-JC-031 47C01-1506-JC-239 |

**Vaidik, Chief Judge.**

# Case Summary

[1] In children in need of services (CHINS) cases, the Department of Child Services (DCS) sometimes proposes changes to the trial court regarding the permanency plan for the children. At the start of the CHINS case, the permanency plan typically calls for reunification of the children with their parents. As the CHINS case proceeds, however, DCS may recommend a number of changes to the plan, including termination of the parents' rights. We determine that when the trial court approves DCS's proposal to change a permanency plan from reunification to termination in a CHINS case, the decision is generally not suitable for interlocutory appeal, particularly where, as here, reunification services are not terminated, because parents are unable to prove actual harm by the change in the permanency plan. Rather, the parents are only able to show the potential for future harm—termination of their parental rights.

[2] In the matter before us, R.O. ("Mother") and C.Q. ("Father") bring their interlocutory appeal challenging the trial court's order approving changes in the permanency plans in their children's CHINS cases from reunification to termination. This Court's motions panel accepted jurisdiction of the interlocutory appeal, and the parties fully briefed the case. Accordingly, we address the merits of the parents' claims. Finding no error, we affirm.

# Facts and Procedural History

[3]     Mother and Father are a non-traditional couple; Father is seventy-nine years old, and Mother is twenty-seven years old. They have a long history with DCS that dates back to 2006. At that time, DCS substantiated a claim of sexual misconduct with a minor against Father; Mother, who was fifteen years old at the time, was the victim. Since then, however, Mother and Father have continued their relationship and have three children together: A.Q., K.Q., and R.Q., born in 2010, 2012, and 2015, respectively.

[4]     In 2013, DCS substantiated claims of neglect of A.Q. and K.Q. against both Mother and Father due to a domestic-violence incident between the parents. Two months later, A.Q. and K.Q. both presented with injuries, and DCS again substantiated claims of neglect against Mother and Father. A.Q. had several physical injuries, some of which were over a year old, and K.Q. had a knot on the back of her head. Tr. Vol. VII pp. 82, 86. A.Q. and K.Q. were removed from the home and later adjudicated CHINS. Mother and Father engaged in services with DCS, and the children were ultimately returned to their care.

[5]     Less than two years later, DCS received an allegation that A.Q. had been physically abused. A.Q. "had several marks and bruises on her," including a bruise about "1 ½ inches in diameter on her chin that was purple." *Id.* at 7. DCS responded the same day and went to Mother and Father's house to speak with them and A.Q. Upon seeing the "almost black" bruise on A.Q.'s chin and other bruises on her head, DCS told Mother and Father to take A.Q. to the

hospital. *Id.* Photographs of the bruises were taken and sent to a doctor at Riley Hospital for Children. Based on the photographs and A.Q.'s medical records, the doctor concluded that A.Q. was injured as a result of physical abuse. The doctor told DCS, "To obtain an injury to that degree, there must have been a lot of force behind it. . . . . [A.Q.] was either propelled to the floor or someone hit her directly under the chin." *Id.* at 8. The doctor also stated that the other injuries to A.Q.'s head were consistent with A.Q. being grabbed or slapped. Mother and Father both stated that they did not know how A.Q. was injured and that the bruise appeared after A.Q. came home from school. DCS immediately removed A.Q. and K.Q. from the home and placed them with Father's granddaughter ("foster mother"). At the time of removal, Mother was pregnant with R.Q. On January 28, DCS filed CHINS petitions for both A.Q. and K.Q., and three months later, the children were adjudicated CHINS.

[6] Meanwhile, the Lawrence County Sheriff's Department was informed of A.Q.'s injuries and launched a criminal investigation. In March 2015, Mother was charged with Level 5 felony battery of a child less than fourteen years old. The criminal court issued a no-contact order for Mother and A.Q.

[7] A dispositional hearing in the CHINS cases was held in June 2015. Six days later, Mother gave birth to R.Q. Because of the CHINS adjudications for A.Q. and K.Q., DCS removed R.Q. from Mother and Father's care while still in the hospital. R.Q. was also placed with foster mother, and DCS filed a CHINS petition for R.Q. On September 8, the court entered its dispositional order in A.Q. and K.Q.'s CHINS cases. Mother and Father were ordered, in part, to

maintain weekly contact with the Family Case Manager (FCM), keep all appointments with service providers, engage in home-based counseling, and have supervised visits with A.Q. and K.Q. The permanency plan for A.Q. and K.Q. was reunification with Mother and Father.

[8] Around the same time as the dispositional order, A.Q. disclosed that Father had sexually abused her, and DCS substantiated the claim. K.Q. also made statements that Mother and Father had abused A.Q., but K.Q.'s disclosures had already been investigated by DCS. DCS moved to cease all parenting time and visitation for both parents and all three children. In January 2016, the court ordered that all parenting time and communication with A.Q. and her parents cease. However, the court ordered that K.Q. and R.Q. should continue to have supervised visitation with Mother and Father. It was also ordered that A.Q. and K.Q. undergo psychological evaluations to determine if they had been coached regarding the disclosures of abuse.

[9] Dr. Linda McIntire conducted the psychological evaluations. She met with Mother and Father and met individually with A.Q. and K.Q. Based on her interactions with Mother and Father, Dr. McIntire believed that they had not made any progress in their therapy because they "would not own that they'd done anything wrong," and she found their level of denial to be "pretty concerning." Tr. Vol. IV pp. 187, 206. Regarding her time with A.Q. and K.Q., Dr. McIntire noted that, over the course of the multi-day evaluation, K.Q. refused to discuss Father at all but was willing to talk about Mother. Dr. McIntire stated, "[W]hen a child refuses to speak, that is a painful avoidance.

That is not coaching." *Id.* at 143. Dr. McIntire ultimately concluded that neither child had been coached regarding their disclosures of abuse. She explained that Mother and Father's claim of coaching was a "manifestation of their pervasive denial of any wrong-doing, any problems, and any culpability relative to their children[.]" Appellants' App. Vol. II p. 197.

[10] Meanwhile, R.Q.'s CHINS case and Mother's criminal case were moving forward. In January 2016, the court held a fact-finding hearing in R.Q.'s CHINS case. R.Q. was adjudicated a CHINS and a dispositional order was entered in April 2016. In part, the parents were ordered to participate in individual and couples therapy, contact the FCM at least once a week, and participate in home-based services. The permanency plan for R.Q. was reunification. As for Mother's criminal case, she pled guilty in January 2016 to battery of a child less than fourteen years old. She was sentenced to three years of supervised probation and forty hours of community service. The criminal court also ordered her to cooperate fully with DCS.

[11] In July 2016, DCS petitioned the court to approve changes in the permanency plans for all three children from reunification to termination. In its motion, DCS argued that the change was necessary because of the "lack of progress" Mother and Father had made with service providers and because of the "need

for these children to live in a safe and permanent home." *Id.* at 212. A multi-day permanency hearing began on October 31 and concluded on July 18, 2017.[1]

[12] In December 2016, while the permanency hearing was still ongoing, the trial court ordered Mother and Father to submit to psychological evaluations. Dr. Bart Ferraro conducted both evaluations. Regarding Mother, Dr. Ferraro noted that she was "stress sensitive, psychologically immature . . . apt to repeat problems and be slow to learn from her experience." Appellants' App. Vol. III p. 3. He added that Mother "will demonstrate difficulty over time attuning, appreciating, and addressing satisfactorily, the needs and feelings of others." *Id.* As for Father, Dr. Ferro found that Father, like Mother, "has an ability to rise to a higher level of functioning for a delimited period, but may, over time and unmonitored, gravitate to more deficient habits and patterns should external support and guidance be removed." *Id.* at 16.

[13] Over the course of the hearing, multiple DCS service providers testified. The providers stated that Mother and Father were some of the most compliant parents that they had every worked with, attending every appointment. However, most of the providers noted that Mother and Father had made no progress in services, especially individual therapy. FCM Christina Taylor said that Mother and Father had attended every therapy session but that they

---

[1] The main reason for the lengthy permanency hearing was that six parties (DCS, Mother, Father, the foster mother, the Court Appointed Special Advocate, and the maternal grandmother), all represented by counsel, participated in the hearing.

refused to take any responsibility for the January 2015 injuries to A.Q. FCM Taylor further testified that the goals of the dispositional decree had not been met and that the reason for removal had not been remedied. She also explained that changes in the permanency plans would not result in DCS terminating services for Mother and Father.

[14] George Freeman, who was the parents' therapist in their 2013 CHINS case, was again appointed as Mother and Father's therapist. He provided the parents with individual and couples counseling. Freeman stated that the parents would not admit that there was any kind of problem with their parenting style and that they were not at fault for any of the injuries. Tr. Vol. V pp. 92, 95. He opined that the parents were at a "stalemate" with DCS because the parents wouldn't admit to any wrongdoing. *Id.* at 92. He added that Father blames the foster mother, DCS, and the service providers for his and Mother's current situation. *Id.* at 118. Nevertheless, Freeman stated that he had no concerns with the children being placed back in the parents' home. He admitted that he had made a similar recommendation in the 2013 CHINS case, that A.Q. and K.Q. were returned to Mother and Father's care, and that the children were removed again in 2015 for the same reasons they were removed in 2013.

[15] A.Q. and K.Q.'s therapist, Lowry Adams, testified that the children were thriving in their foster home. Adams noted that K.Q. had some regression in her behavior—throwing herself down on the floor screaming—because she did not want to go on visits to Mother and Father's house or have nightly phone calls with them. She added that A.Q. was "terrified of her biological parents"

but had been able to improve in therapy because she felt safe in her foster home and had not gone on visits with her parents. Tr. Vol. V p. 18. Adams said, "with all certainty," that visitation with the parents should not increase. Tr. Vol. IV p. 235.

[16] The visit supervisor, Andrew George, stated that K.Q. had verbally expressed to him that she did not want to go on visits with Mother and Father. Despite these expressions, George thought Mother and Father should progress from supervised to monitored visits with K.Q. and R.Q.

[17] Father also testified at the hearing. He stated that he had "a lot of issues" with the foster mother and that he thought that "everything [was] pretty much [her] fault." Tr. Vol. VI p. 71.

[18] After the hearing concluded, the trial court issued its order approving DCS's proposed changes to the permanency plans. Mother and Father each petitioned the court to certify its order for interlocutory appeal, and DCS did not respond to either petition. The trial court certified its order, and Mother and Father asked this Court to accept jurisdiction over their appeal. DCS did not respond to the motion. The Court's motions panel granted the motion, and this interlocutory appeal ensues.

# Discussion and Decision

[19] Mother and Father contend that the trial court's order approving the changes to the permanency plans from reunification to termination was clearly erroneous.

Before we address their argument, we first must address DCS's argument that this appeal is "premature." Appellee's Br. p. 26.

[20] DCS claims that the changes to the permanency plans have not caused the parents actual harm. It relies on our decision in *In re K.F.*, 797 N.E.2d 310 (Ind. Ct. App. 2003), to support its position. In *K.F.*, the court issued an order approving DCS's proposed change to the permanency plan from reunification to termination. The *K.F.* parents did not petition for interlocutory appeal but rather appealed the court's order as a final judgment. We held, in part, that the change in a permanency plan from reunification to termination is not an appealable final judgment because parents "are not prejudiced by the permanency plan" because the change does not terminate parents' rights and parents "may challenge the propriety of terminating their parental rights and hold [DCS] to the stricter burden of proof required in such cases." *Id.* at 315. Despite the procedural differences in *K.F.* and the matter before us, we find DCS's argument persuasive. For the same reasons articulated in *K.F.*, we hold that an interlocutory appeal of a change in the permanency plan is generally premature. The change does not prejudice the parents because they still have a separate termination hearing, and the evidentiary burden on DCS to prove that termination is appropriate is higher than what DCS is required to prove in order to change the permanency plan from reunification to termination.

[21] DCS, however, did not respond to Mother's or Father's request for the trial court to certify its order for interlocutory appeal. Nor did DCS respond to Mother and Father's motion for this Court to accept jurisdiction of their appeal

after the trial court certified its order. Instead, DCS raised its argument for the first time in its brief. Because we accepted jurisdiction over the appeal and the parties have fully briefed the issue, we address Mother's and Father's arguments. Mother and Father appealed separately, and, where possible, we have consolidated their arguments.

[22] Permanency plans are part of the CHINS case, and decisions in CHINS cases are reviewed for clear error. *In re S.K.*, 57 N.E.3d 878, 881-82 (Ind. Ct. App. 2016). Here, the parties agree that a change in the permanency plan should also be reviewed for clear error. Father's Br. p. 8; Mother's Br. p. 18; Appellee's Br. p. 27. We will neither reweigh the evidence nor judge the credibility of the witnesses. *In re D.F.*, 83 N.E.3d 789, 796 (Ind. Ct. App. 2017). Rather, we consider only the evidence that supports the court's determination and reasonable inference drawn therefrom. *Id.*

[23] The parents argue that the evidence is insufficient to support the trial court's order. They contend that the court's finding that they are only in partial compliance with services is clearly erroneous and unsupported by the record. Mother and Father are correct that FCM Taylor stated, "They are the most compliant people I've met. They go to everything that they are supposed to go to." Tr. Vol. V p. 248. But the full findings state:

> Mother is partially in compliance with the plan as follows:
> Mother has been participating in services including home based
> case management and therapy. Mother has not made the
> necessary progress in therapy and home based case work to
> maintain a viable permanency plan of reunification.

> Father is partially in compliance with the plan as follows: Father has been participating in services including home based case management and therapy. Father has not made the necessary progress in services to maintain a viable permanency plan of reunification.

Appellants' App. Vol. III p. 23. Throughout the four-day permanency hearing, FCM Taylor and therapist Freeman testified multiple times that Mother and Father were attending their service appointments, but the parents were not making progress with their individual therapy. Namely, Mother and Father refused to accept responsibility for the injuries A.Q. sustained in January 2015, and they continued to blame others for their current situation. Father even testified that "everything is pretty much [foster mother's] fault." Tr. Vol. VI p. 71. The evidence is sufficient to support the trial court's finding that Mother and Father were not progressing with services, therapy, and home-based services to maintain permanency plans of reunification.

[24] The parents also contend that DCS did not provide reasonable services aimed at reunification. They argue that services provided to A.Q. were inadequate to support reunification because they had not seen her since March 2015 (Mother) and January 2016 (Father). DCS provided Mother and Father with individual therapy, couples therapy, home-based services, and supervised visits. A.Q. was given individual therapy to address her fears surrounding reunification. Again, the parents ignore the fact that they made no progress in therapy to address their actions, which is why the no-contact order was not lifted.

Furthermore, the parents claim that DCS replaced therapist Freeman and visit supervisor George after each testified that they had no issue with Mother and Father progressing to monitored visits and reuniting with the children. They contend that this is proof that DCS did not provide the necessary services for reunification. We agree that, as an isolated incident, the replacement of service providers who recommend reunification would be alarming. However, when taken in the context of the case as a whole, we do not agree with the parents' position. At the time Freeman and George were replaced, the case had been ongoing for over two years, and Freeman himself testified that Mother and Father were not willing to take accountability for what happened to A.Q. in January 2015. Furthermore, DCS did not just replace Freeman and George; it also replaced therapist Adams who recommended "with all certainty" that Mother and Father not be given more visitation time. The evidence is sufficient to show that DCS was providing necessary services for reunification.

Additionally, Father raises a separate, distinct argument: his constitutional rights were violated by keeping A.Q. from him and Mother. In support of his argument, Father cites to our holding in a termination-of-parental-rights case, *Lang v. Starke County Office of Family and Children*, 861 N.E.2d 366 (Ind. Ct. App. 2007), *trans. denied*. But in *Lang*, we stated, "A parent has a constitutional right to raise his or her children, but this right is not absolute and must be subordinated to the children's interests when the children's emotional and physical development is threatened." *Id.* at 371. Father contends that his due-process rights were violated and that he "did everything DCS and the Court

asked him to. And yet, neither Parent was ever even offered an opportunity to see the child." Father's Br. p. 12. But Father was given a fair, multi-day hearing to address reunification with A.Q. During that hearing it was repeatedly stated that Father and Mother were unwilling to take any responsibility for A.Q.'s January 2015 injuries—the reason why the children were removed from the home. Father also contends that the trial court's no-contact order was not narrowly tailored because "Father was not accused of battery, yet he was given the same treatment as Mother who was charged and convicted of a crime." *Id.* Father fails to mention that the reason the trial court entered a no-contact order for both parents was A.Q.'s substantiated claim of sexual abuse by Father. Father would not discuss this claim with therapist Freeman other than to say that he did not do it and that A.Q. was coached into making that admission. Father has not convinced us that his constitutional rights were violated.

[27] Mother also makes a separate, distinct argument: the court's order was clearly erroneous because it did not include a concurrent plan for reunification. "Concurrent planning . . . requires the identification of two (2) permanency plan goals and simultaneous reasonable efforts toward both goals with knowledge of all participants." Ind. Code § 31-9-2-22.1(b). Mother contends that DCS should have proposed a concurrent permanency plan that included reunification because she and Father were "active" participants in services and progressed in services. Mother's Br. p. 27. She also claims that the concurrent plan was in the best interests of the children given "the length of time it would

take to proceed through a termination proceeding[.]" *Id.* Mother is correct that Indiana Code section 31-9-2-22.1 permits a trial court to adopt a concurrent permanency plan, but the statute does not mandate that DCS propose a concurrent permanency plan or that the court adopt a concurrent permanency plan. Additionally, the changes to the permanency plans do not terminate reunification services for Mother and Father. Regardless of the time it takes for the termination proceeding to be completed, Mother and Father are able to participate in services and make the necessary progress to regain custody of their children. *See* Appellants' App. Vol. III pp. 22-25 (the trial court's order approving the permanency changes does not order DCS to stop reunification services); Tr. Vol. V p. 146 (FMC Taylor testifying that changes to the permanency plans would not stop DCS from offering the parents or children services aimed at reunification). Furthermore, when the court issued its order in November 2017, this case had been ongoing for almost three years. During that time, Mother and Father had not made any progress in their individual therapy. Accordingly, the court's decision to adopt a singular plan for permanency was not clearly erroneous.

[28] In summary, there was sufficient evidence presented over the four-day permanency hearing to support the trial court's order approving the proposed changes to the permanency plans from reunification to termination. The trial court's order was not clearly erroneous. Furthermore, we reiterate that a change in the permanency plan from reunification to termination is generally not suitable for interlocutory review, particularly where, as here, DCS and the

court continue reunification services, because parents cannot show actual harm from the change; they can only show the potential for future harm.

[29] Affirmed.

Pyle, J., and Barnes, Sr. J., concur.