## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 01 2018, 8:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT: K.W.

Andrew R. Falk
Indianapolis, Indiana

ATTORNEY FOR APPELLANT: P.M. Jr.

Melinda K. Jackman-Hanlin
Greencastle, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: E.M., S.M., A.M., and P.M. III, Children Alleged to be in Need of Services,

K.M. (Mother) and
P.M., Jr. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

November 1, 2018

Court of Appeals Case No. 18A-JC-822

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause Nos.
32D03-1709-JC-156
32D03-1709-JC-157
32D03-1709-JC-158
32D03-1709-JC-159

**Vaidik, Chief Judge**

# Case Summary

[1] P.M., Jr. ("Father") appeals the trial court's determination that his four children (S.M., E.M., P.M. III, and A.M.) are children in need of services (CHINS). K.M. ("Mother") separately appeals the trial court's determination that her two children (P.M. and A.M.) are CHINS. Finding no error, we affirm.

# Facts and Procedural History

[2] In July 2017, Father and Mother (collectively, "Parents") were married and lived with their two children, P.M., born in September 2013, and A.M., born in August 2015, in Clayton.[1] Father's children from his previous marriage to K.S.—S.M., born in October 2005, and E.M., born in August 2007—also lived with them.[2]

[3] On July 17, Hendricks County DCS received multiple reports alleging that S.M., E.M., P.M., and A.M. were victims of neglect. One of the reports alleged that the children:

---

[1] Mother has a history with DCS. In May 2017, Putnam County DCS received multiple reports concerning A.M. DCS substantiated Mother's neglect of A.M. but could not locate Mother. During the assessment, Father denied knowing where Mother was. Father was not involved in the Putnam County assessment. Putnam County dismissed its CHINS case when Hendricks County DCS filed its CHINS petitions at issue in this appeal. *See* Mother's App. Vol. II p. 56; *see also* Tr. Vol. II pp. 45-56.

[2] K.S. was involved throughout the CHINS proceedings but does not appeal the trial court's determination that her two children, S.M. and E.M., are CHINS.

are not being fed and the children do not have basic needs in the home . . . [P.M.] has bumps and scabs all over his body. [Father] refuses to take the children to the doctor. The home is deplorable. [Father] is mean and smack[s] the children. [Father] smacks [P.M.] the hardest. [P.M.] always has marks and bruises on him. [Parents] have a lot of domestic violence. [Parents] break up on and off and stay inside often due to their fighting.

Mother's App. Vol. II p. 20. Other reports included additional allegations that: the children "ha[d] scabies"; there was "sewage running underneath the home"; and Father "use[s] methamphetamine when he has the money." *Id.* at 21. After receiving these reports, Family Case Manager (FCM) Steven Junkersfeld was assigned by DCS to conduct an assessment.

[4] That same day, FCM Junkersfeld visited Parents' house. When FCM Junkersfeld arrived, Mother, P.M., and A.M. were home and Father was at work. The house was in poor condition. There were holes in the walls and floors and electrical wires running throughout the house. The house was cluttered with trash and power tools, and other "miscellaneous objects" were on the floor within reach of P.M. and A.M. Tr. Vol. II p. 74. FCM Junkersfeld saw P.M. running around unsupervised and playing with the power tools. FCM Junkersfeld also saw A.M. sleeping "face down in a bunch of clothing." *Id.* at 73. After FCM Junkersfeld asked Mother to move A.M. into a different position (because he was worried about safe sleep), FCM Junkersfeld saw "bruising" on A.M.'s body, including on the sides of her arms and "several on [her] leg." *Id.* at 76. He also noticed a "decent sized knot on [A.M.'s] forehead." *Id.* Mother's explanation for the bruises and knot on A.M.'s head

was "kids are kids. They're just playing around." *Id.* FCM Junkersfeld also observed P.M. and saw that he had "scabs head to toe." *Id.* at 74. Mother said the scabs were "just poison ivy. The other kids had it, it'll just go away." *Id.* During the visit, Mother disclosed to FCM Junkersfeld that she "had anxiety, depression and personality disorder and . . . hasn't had, um, any medical attention . . . since April . . . ." *Id.* at 76. After FCM Junkersfeld finished making his observations, he called a doctor to get a recommendation as to whether the children needed to be seen by medical professionals. The doctor recommended that the children be taken to the emergency room immediately to be evaluated.

[5] FCM Junkersfeld relayed this information to Mother (who was willing to let the children be seen) and then called Father to notify him of the doctor's recommendation. Father responded that "the children will not be seen. They're not getting any medical treatment." *Id.* at 77. Father was "very irate" and told FCM Junkersfeld to leave the house immediately because "he [did not] like that another male [was] talking to [Mother.]" *Id.*; *see also id.* at 93-94. After speaking with Father, FCM Junkersfeld left Parents' house and spoke with other DCS staff. Ultimately, DCS determined that the children needed to be removed.

[6] A few hours after he left, FCM Junkersfeld returned to Parents' house to remove the children. By that time, Father had gotten off work and was at the house. FCM Junkersfeld spoke with Father about the situation and Father responded, "[T]his is stupid I do not know why you are taking my kids away

from me." Mother's App. Vol. II p. 22. Father also commented that DCS's concerns were "ridiculous." *Id.* During their conversation, FCM Junkersfeld asked Father if he would take a drug screen and Father refused. After speaking with Father, FCM Junkersfeld removed the two younger children, P.M. and A.M., and took them to the hospital (S.M. and E.M. were not home at the time because they were staying at a family member's house). At the hospital, P.M. and A.M. were diagnosed with scabies and prescribed treatment. FCM Junkersfeld called Parents to update them on the status of P.M.'s and A.M.'s medical evaluations. During the conversation, Father informed FCM Junkersfeld that while he was cleaning the house he found drug paraphernalia that belonged to his brother and that he had gotten rid of it. FCM Junkersfeld offered Father another drug screen but, once again, Father refused.

[7] After P.M. and A.M. were seen by physicians, they were placed in foster care. The next day, FCM Junkersfeld spoke with K.S. and told her about the situation. During the conversation, K.S. "expressed concerns of . . . domestic violence and . . . [that] the kids [were] not getting treatment . . . ." Tr. Vol. II p. 79. FCM Junkersfeld discussed placing K.S.'s two children with her, but she was living with someone who did not pass a drug screen, so S.M. and E.M. were placed with their maternal grandmother. Before completing his portion of the assessment, FCM Junkersfeld put in referrals and offered numerous services to the family, including a mental-health evaluation for Mother, a substance-abuse evaluation for Father, and domestic-violence and parenting assessments

for Parents. Parents rejected the services and told FCM Junkersfeld that they "don't want to do services." *Id.* at 95.

[8] On July 21, Scott Butrum from Hendricks County Planning and Building visited Parents' residence and declared the property unsafe. Butrum posted a notice that the house was unsafe because there were "a lot of unsafe issues for children or adults." *Id.* at 59. That same day, Hendricks County DCS requested authorization to file CHINS petitions for all four children. The trial court granted the requests, and DCS filed a CHINS petition for each of the four children. To comply with statutory time limits, the original CHINS petitions were dismissed by the trial court on September 20, and DCS filed new petitions containing the same allegations on September 22.

[9] In the petitions, DCS alleged that the children were in need of services pursuant to Indiana Code section 31-34-1-1, as the children's physical or mental conditions were seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of Parents to supply the children with necessary food, clothing, shelter, medical care, education, or supervision. The CHINS petitions further asserted that the children needed care, treatment, or rehabilitation that they were not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court. On September 22, the trial court held an initial/detention hearing, appointed counsel to represent Mother, Father, and K.S., and continued the children's detention outside the home. *See id.* at 40-41.

[10] On October 31, the trial court held a fact-finding hearing on the four CHINS petitions. FCM Constance Besner testified that sometime in late July, the case was transitioned from FCM Junkersfeld to her. FCM Besner stated that on August 18, she visited Parents' house and spoke with Mother, who was the only one home at the time. After her visit, FCM Besner said she contacted Father to arrange a meeting, but Father refused to meet with her. FCM Besner also testified that she contacted K.S. and spoke with her over the phone. FCM Besner said that, during their conversation, K.S. told her that Father "hit her regularly" when they were married and that she was "worried about the domestic violence." *Id.* at 106-107; *see also id.* at 135. FCM Besner testified that throughout her involvement in the case, she had offered Parents every service possible, including assessments for domestic violence and substance abuse, counseling, assessments for parenting and mental health, and also offered to provide a home-based case manager. *See id.* at 108. FCM Besner said that Mother took advantage of some of these services and began working with a home-based case manager. FCM Besner also testified that Mother asked her, during a visit to see P.M., if "the domestic violence people [could] call her" because "in her past she has experienced, um, domestic violence." *Id.* at 109, 121. Aside from Mother's limited participation, FCM Besner said that Parents did not accept the services she offered.

[11] FCM Besner also testified that she had provided services to the children. S.M. and E.M. were referred to counseling to work on issues of domestic violence. Their therapist, Arie Anderson, testified and recommended that the children's

treatment include cognitive behavioral therapy. FCM Besner testified that P.M. was referred for a trauma assessment because "he ha[d] experienced some kind of trauma." *Id.* at 112. P.M. was also referred for an Individualized Education Program (IEP) because he was assessed for pre-kindergarten and in some areas he was "well below average." *Id.* FCM Besner referred A.M. for additional doctor appointments to ensure that she receives regular medical care.

[12] Mother testified and stated that she was not a victim of domestic violence and that she did not request domestic-violence counseling because she needed it, but "because DCS wanted [her] to do it and [she] wanted to [do] whatever it took to get [her] kids back." *Id.* at 148. Mother also explained her mental-health issues, stating that she has a personality disorder that made her "depend on [Father] for everything." *Id.* at 151. Father testified and explained that he was upset that FCM Junkersfeld was talking to Mother because he thought he may be "impersonating a police officer," something he had heard about on the radio. *Id.* at 165. Father also explained that his reasons for refusing to take a drug screen were because he "didn't want to have anything to do with it"; it "wasn't the best time to ask him"; and he "just wanted [DCS] to leave." *Id.* at 165-66. When questioned about why he did not accept services offered by FCMs Junkersfeld or Besner, Father stated, "I'm stubborn, I guess . . . I just didn't see what I'd done wrong. And, I didn't see any services that I needed to take. I just want my children to come home. I didn't do anything wrong." *Id.* at 167. When the allegations of domestic violence were brought up, Father repeatedly called them "absurd" and stated:

I don't know, I don't know where it came from. I don't understand, I mean, I've never, I've never hurt anybody. So, I don't know, I don't know where that all was stemmed from. It's just allegations as far as I understand.

*Id.* at 172. Court Appointed Special Advocate (CASA) Lee Anne Owens testified that she would have concerns if the children were returned to Father's care. CASA Owens also relayed that she had spoken to K.S., who had expressed to her that "she is relieved that there is DCS involvement at this point." *Id.* at 182.

[13] Following the presentation of the evidence, the trial court took the matter under advisement. On February 13, 2018, the trial court issued an order adjudicating all four children CHINS pursuant to Indiana Code 31-34-1-1. The trial court entered findings to support its order, which include:

*****

11.  Since they were removed from the home, [S.M. and E.M.] have been involved in cognitive behavior therapy to help them work through the trauma they have suffered during their childhood. Their trauma primarily relates to domestic violence in the home.

12.  When Family Case Manager, Steven Junkersfeld ("FCM Junkersfeld") went to [Parents'] home, he observed [A.M.] sleeping on the floor, face down in a pile of blankets. FCM Junkersfeld was concerned about "safe sleep". He also observed bruising on her face and body. The Court specifically finds FCM Junkersfeld credible. FCM Junkersfeld observed debris throughout the home, holes in

the floor, holes in the walls, electric cords running everywhere. [P.M.] was running throughout the home and had scabs from head to toe. [Mother] told FCM Junkersfeld it was poison ivy.

*****

14. [Mother] agreed the children should go to the doctor, but Father refused to allow the children to receive medical treatment. [Mother] could not or would not take the children to the doctor without Father's approval and consent.

15. Father was very upset that [Mother] was talking to another man, i.e., FCM Junkersfeld.

16. FCM Junkersfeld removed [A.M. and P.M.] from the home and took them to receive medical care. Both children were diagnosed and treated for scabies. A skeletal survey of A.M. revealed she had swallowed a foreign object and surgical removal was considered, but [A.M.] did pass the object without surgery.

17. [K.S.] expressed concern that [E.M. and S.M.] were exposed to domestic violence in Father's home and that they needed medical attention. [K.S.] could not protect the children because Father had full legal and physical custody and her parenting time was supervised by Court Order.

18. DCS offered services to [Mother]. [Mother] declined services. [Mother] appeared to want help, but she would not accept services without Father's consent. DCS offered services to Father and Father refused to cooperate.

[Mother] was offered mental health assessment and services, domestic violence assessment and services.

19. Domestic violence was present in Father's relationship with [Mother] and in Father's relationship with [K.S.].

*****

21. Constance Besner is also a Family Case Manager with Hendricks County DCS. ("FCM Besner"). The Court finds Ms. Besner credible. With Ms. Besner's guidance, [Mother] did start working with home-based case management to learn how to keep the home organized and free from debris.

[Mother] did schedule an appointment concerning her mental health in November 2017. However, based on the totality of the evidence, the Court is convinced that [Mother's] cooperation is contingent upon Father's consent and approval.

The Court has observed Father and [Mother] in Court. Based on their demeanor and interaction[s] observed by the Court and with the evidence presented, the Court concludes that Father is a domineering individual. Father calls the shots in his home. Unless Father is required by the Court to participate in services for domestic violence, all four (4) children's mental health is seriously impaired or seriously endangered.

*****

24. Since removal, [P.M.] has received an IEP at school and was being assessed for trauma. He also receives additional

help for speech and understanding because he tested well below average for his age.

25. Father does not want to cooperate with DCS. Father will not cooperate without the coercive intervention of the Court.

Mother's App. Vol. II pp. 56-58. Accordingly, the trial court concluded that DCS proved by a preponderance of the evidence that the children's "physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of [Parents] to supply the children with necessary medical care, supervision free from domestic violence, and the children need care, treatment and rehabilitation that they will not receive without the coercive intervention of the Court." *Id.* at 58. On March 7, the trial court held a dispositional hearing and thereafter issued a dispositional order requiring Father and Mother to participate in reunification services. DCS was awarded wardship of the children. S.M. and E.M. were ordered to remain in the care and custody of their maternal grandmother, and P.M. and A.M. were ordered to remain in the care and custody of their foster parents.

[14] Father and Mother separately appeal.

# Discussion and Decision

[15] Father and Mother contend that the evidence is insufficient to support the trial court's determination that the children are CHINS. We consolidate their arguments and address them as one where possible.

[16]     A CHINS proceeding focuses on the best interests of the children, not the guilt or innocence of the parents. *In re D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). The purposes of a CHINS case are to help families in crisis and to protect children, not to punish parents. *Id.* A CHINS proceeding is civil in nature, so the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Indiana Code section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

> (2) the child needs care, treatment, or rehabilitation that:

>> (A) the child is not receiving; and

>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

In other words, this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014), *reh'g denied*. The final element "guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the ability to provide for their

children, not merely where they encounter difficulty in meeting a child's needs." *Id.*

[17] When determining whether there is sufficient evidence to support a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re D.F.*, 83 N.E.3d 789, 796 (Ind. Ct. App. 2017). Rather, we consider only the evidence that supports the trial court's determination and reasonable inferences drawn therefrom. *Id.* There is no statute that expressly requires formal findings in a CHINS fact-finding order. *S.D.*, 2 N.E.3d at 1287. Where, as in this case, neither party requests findings under Indiana Trial Rule 52(A) and the trial court enters findings and conclusions sua sponte, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment for the issues covered by findings. *Id.* Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the resulting judgment. *Id.*

# I. Findings of Fact

[18] Father contends that the evidence does not support six of the trial court's twenty-seven findings.[3]  *See* Father's Br. p. 17.  First, Father challenges finding 15: "Father was very upset that [Mother] was talking to another man, i.e. FCM Junkersfeld."  Father's App. Vol. II p. 28.  Father argues that he testified that "[he] feared for the safety of his family" since he had heard on the radio that "some guy . . . had been . . . impersonating a police officer[,]" not that Mother was prohibited from speaking to men.  Tr. Vol. II p. 165; *see also* Father's Br. p. 17.  However, FCM Junkersfeld testified that Father told him that "he doesn't like that another male is talking to [Mother] . . . ."  Tr. Vol. II p.77; *see also id.* at 93-94.  The trial court is free to choose whom to believe.  Here, the trial court found FCM Junkersfeld credible, and his testimony supports finding 15.

[19] Father then challenges findings 18, 25, and part of finding 21:

>     18.    DCS offered services to [Mother].  [Mother] declined
>            services.  [Mother] appeared to want help, but she would
>            not accept services without Father's consent.  DCS offered
>            services to Father and Father refused to cooperate.
>
>                             *****
>
>     21.    . . . [Mother] did schedule an appointment concerning her
>            mental health in November 2017.  However, based on the

---

[3] In his brief, Father challenges paragraphs 28 and 29 as findings.  But Paragraphs 28 and 29 are not "findings"; rather, they are conclusions of law.

> totality of evidence, the Court is convinced that [Mother's] cooperation is contingent on Father's consent and approval.
>
> *****
>
> 25.  Father does not want to cooperate with DCS. Father will not cooperate without the coercive intervention of the Court.

Father's App. Vol. II pp. 29-30. Father argues that he was "willing to cooperate with [DCS] and was willing to obtain the necessary medical treatment." Father's Br. p. 20. Father bases his argument his own testimony that he planned on taking the children to get medical treatment, sought medical treatment for himself without court order, and his refusal of drug screens was permitted because he was not obligated to submit to a drug screen. *See* Tr. Vol. II pp. 164-165. However, Father also testified that he is "stubborn" and "didn't see any services that [he] needed to take." *Id.* at 167. FCM Junkersfeld testified that Father had rejected all the services he offered the family and told him that "[he and Mother] don't want to do services." *Id.* at 95. FCM Besner also testified that when she took over the case, she continued to offer services and that Father not only refused services but refused to even meet with her. *See id.* at 106, 110. Father's argument is a request to reweigh the evidence which we will not do. *See D.F.*, 83 N.E.3d at 796. Here, the trial court chose to believe the testimonies of FCMs Junkersfeld and Besner (both of whom the trial court found credible), which support findings 18, 25, and this part of finding 21.

Father next challenges findings 17, 19, and a second part of finding 21:

> 17.  [K.S.] expressed concern that [E.M. and S.M.] were exposed to domestic violence in Father's home and that they needed medical attention.  [K.S.] could not protect the children because Father had full legal and physical custody and her parenting time was supervised by Court Order.
>
> \*\*\*\*\*
>
> 19.  Domestic violence was present in Father's relationship with [Mother] and in Father's relationship with [K.S.].
>
> \*\*\*\*\*
>
> 21.  . . . Unless Father is required by the Court to participate in services for domestic violence, all four (4) children's mental health is seriously impaired or endangered.

Father's App. Vol. II p. 29.  Father argues that "there was no evidence presented that Father had committed domestic violence or that the children were subjected to or exposed to domestic violence."  Father's Br. pp. 18, 20.  However, FCM Besner testified during the fact-finding hearing that E.M., S.M., and P.M. were receiving counseling for domestic violence and that K.S. told her that Father "hit her regularly" during their marriage and that "she was worried about the domestic violence."  Tr. Vol. II pp. 106-107.  FCM Besner also testified that "[Mother] asked me if I could have the domestic violence people call her" because "in her past, she has experienced, um, domestic

violence." *Id.* at 109, 121. Although Mother testified that she was not a victim of domestic violence and had requested domestic-violence counseling because she "wanted to [do] whatever it took to get [her] kids back," *id.* at 148, and Father testified that any allegation that he committed domestic violence was false and "absurd," *id.* at 172, the trial court is free to choose whom to believe. In this case, the trial court found FCM Besner credible and her testimony supports findings 17, 19, and this part of finding 21.

[21]     Last, Father challenges the final part of finding 21:

> 21.    The Court has observed Father and [Mother] in Court. Based on their demeanor and interaction observed by the Court and with the evidence presented, the Court concludes that Father is a domineering individual. Father calls the shots in his home.

Father's App. Vol. II p. 29. Father argues that "[t]he trial court provides no evidence or testimony to support its finding that Father is a domineering individual or what the trial court observed that would lead the Court to this finding." Father's Br. p. 21. However, during the fact-finding hearing, Mother testified that she suffered from a personality disorder that made her "depend on [Father] for everything." Tr. Vol. II p. 151. FCM Junkersfeld testified that Father "very irate[ly] . . . told me to get out of the home. [Father] doesn't want [Mother] talking to another male . . . ." *Id.* at 93. FCM Junkersfeld also testified that Father said "the children will not be seen" and Mother could not take the children to the doctor without Father's consent. *Id.* at 77. The trial court also had the chance to observe Father and Mother in court and saw how

Father treats Mother. As a general rule, appellate courts grant latitude and deference to trial courts in family-law matters. *D.P.*, 72 N.E.3d at 980. This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this Court's only being able to review a cold transcript of the record. *Id.* Here, we will not second-guess the trial court's observation that Father controls Mother and is the decision-maker in the family. As such, the final part of finding 21 is supported by the testimonies of Mother and FCM Junkersfeld, and by the trial court's own observation of how Father controls Mother.

[22] Therefore, we find that all of the trial court's findings that are challenged by Father are supported by facts and reasonable inferences.

## II. Conclusions of Law

[23] Father and Mother also argue that the trial court erred in determining that S.M.'s, E.M.'s, P.M.'s and A.M.'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of Parents to supply the children with necessary medical care and supervision free from domestic violence, and that the children need care, treatment, and rehabilitation that they will not receive without the coercive intervention of the court.

[24] First, Father and Mother challenge the trial court's conclusion that the children's physical or mental conditions are seriously impaired or endangered by Parents' refusal or neglect to provide their children with medical care.

Mother argues that "mere delay in taking one's children to obtain medical care is not sufficient for the State to then determine that the child is in need of services," Mother's Br. p. 18, and Father argues that he planned on taking the children to get medical treatment, *see* Father's Br. p. 26. However, neither Father nor Mother challenges the trial court's findings 12 (that A.M. had bruises all over her body and P.M. was covered in scabs from head to toe), 14 (that Father refused to allow the children to receive medical treatment), or 16 (that A.M. and P.M. were diagnosed with and treated for scabies). Any unchallenged findings stand as proven. *See B.R.*, 875 N.E.2d at 373. As such, unchallenged findings 12, 14, and 16 support the trial court's conclusion that the children's physical or mental conditions are seriously impaired or endangered by Parent's refusal or neglect to provide the children with medical care. We could stop here because this conclusion alone (that the children needed medical care that was not provided until DCS intervened) is sufficient to uphold the trial court's CHINS determination, but we will continue and address Parents' remaining challenges to the trial court's conclusions.

[25] Next, Father and Mother challenge the trial court's conclusion that the children's physical or mental conditions are seriously impaired or endangered by Parent's inability, refusal, or neglect to provide the children with supervision free from domestic violence. Mother argues that "no evidence was presented of current domestic battery," and "the only hint of current domestic battery was Mother's request for domestic battery counseling." Mother's Br. p. 21. Father argues that "there were no facts that [the children] had been subjected to or

exposed to domestic violence." Father's Br. p. 25. However, neither Father nor Mother challenges the trial court's findings 11 or 24:

> 11. Since they were removed from the home, [S.M.] and [E.M.] have been involved in cognitive behavior therapy to help them work through the trauma they have suffered during their childhood. Their trauma primarily relates to domestic violence in the home.

> 24. Since removal, [P.M.] . . . was being assessed for trauma.

Father's App. Vol. II pp. 28-29. Again, any unchallenged findings stand as proven, *see B.R.*, 875 N.E.2d at 373, and a child's exposure to domestic violence can support a CHINS finding, *see N.E.*, 919 N.E.2d at 106. Furthermore, the domestic-violence findings challenged by Father (i.e., findings 15, 17, 19, and parts of finding 21) support the trial court's conclusion that Parents cannot provide the children with supervision free from domestic violence. To summarize the findings, the following the evidence supports the trial court's conclusion that there is domestic violence in Parents' household: (1) Father "hit [K.S.] regularly" during their marriage; (2) Mother requested to speak with "the domestic violence people" because "in her past, she has experienced . . . domestic violence"; (3) Father "[did not] like that another male [was] talking to [Mother]"; (4) Mother is controlled by Father and depends on him "for everything"; (5) Mother could not take the children to the doctor because Father controls when the children can get medical attention and refused to let his children be seen; (6) S.M., E.M., and P.M. have all been referred to cognitive behavioral therapy because of trauma related to domestic violence;

and (7) the trial court saw Father's treatment of Mother and observed him to be a "domineering individual." Tr. Vol. II pp. 93-94, 106, 109, 121, 151. It is clear from the findings that Father has a controlling nature, which is a sign of domestic violence. Therefore, everything taken together—Father's controlling nature, the unchallenged findings (11 and 24), and the domestic-violence findings challenged by Father (i.e., findings 15, 17, 19, and parts of finding 21)—supports the trial court's conclusion that the children's physical or mental conditions are seriously impaired or endangered by Parent's inability, refusal, or neglect to provide the children with supervision free from domestic violence.

[26] Last, Father and Mother challenge the trial court's conclusion that the children need care, treatment, and rehabilitation that they would not receive without the coercive intervention of the court. Mother argues that "DCS failed to prove by a preponderance of the evidence that . . . [the children's] needs were unlikely to be met without the State's coercion," Mother's Br. p. 15, and Father argues that DCS "did not prove Father was not willing to participate in necessary recommended services without the coercive intervention of the Court," Father's Br. p. 25. However, findings 18 (that Mother would not accept services without Father's consent and Father refused services) and 25 (that Father does not want to cooperate with DCS) support the trial court's conclusion that the coercive intervention of the court is necessary to ensure the needs of the children are met.

[27] We conclude that the trial court's determination that S.M., E.M., P.M., and A.M. are CHINS is not erroneous.

[28]     Affirmed.

Riley, J., and Kirsch, J., concur.